[No. 2336]

ARNE W. PARUS, PETITIONER, v. THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF THE STATE OF NEVADA, IN AND FOR THE COUNTY OF ELKO, AND E. J. L. TABER, THE JUDGE THEREOF, RESPONDENTS.

[174 Pac. 706]

1. GRAND JURY—WHO MAY SERVE—"QUALIFIED ELECTOR."
   Under Const. art. 1, sec. 8, art. 2, sec. 1, as amended in 1877, art. 4, sec. 27, Rev. Laws, 4929, 4931, 4937, women, being "qualified electors," may serve on the grand jury.

2. GRAND JURY—MEMBERS—COMPETENCY.
   One who bases an opinion as to a crime merely upon rumors and current publications is not disqualified from serving on grand jury, returning an indictment, as to such crime, under Rev. Laws, 7005, subd. 6.

3. GRAND JURY—SELECTION OF MEMBERS.
   Where in drawing, summoning, and impaneling the grand jury there is a substantial compliance with Rev. Laws, 4931, on the part of the designated officers, and where this compliance indicates freedom from bias or prejudice, an indictment will not be set aside for any technical defect.

PROCEEDINGS in prohibition by Arne W. Parus against the District Court of the Fourth Judicial District of the State of Nevada, in and for the County of Elko, and Hon. E. J. L. Taber, the Judge thereof. **Writ denied,** COLEMAN J., dissenting.

*James Dysart* and *Curler & Castle,* for Petitioner:

Upon the record in the case, appellant challenges the jurisdiction of the district court to try him on the

accusatory paper returned by the body assuming to act as a grand jury, and for the following reasons insists that a writ should issue prohibiting the said court from proceeding to try him under the so-called indictment:

That the body which brought in this accusatory paper was not a legally constituted grand jury, in that it consisted of persons not qualified to act as grand jurors; that a person acted upon said accusatory body who, though having the general qualifications of a grand juror, was disqualified by reason of entertaining a state of mind at and prior to the time when the charge embraced in the pretended indictment was under consideration which prevented said person from acting impartially and without prejudice to the substantial rights of the defendant; and that the accusatory body which brought in the pretended indictment was not selected by the officers prescribed by law, but was selected by the district judge, acting alone.

By the authorities, the law is settled beyond controversy that, under the common law and the statutes of the Territory of Nevada at the time of the adoption of the constitution, only good and lawful men were qualified to act as grand jurors or petit jurors; that when the constitution was adopted providing that no man should be tried for a capital or infamous offense unless he were indicted by a grand jury, the framers of the constitution had in view a grand jury as it existed at the common law and by statute at the time of the adoption of the constitution. Const. Nev., art. 1, sec. 8; Ency. Law & Proc., p. 740; People v. Draper, 15 N. Y. 532; People v. Lynch, 21 Cal. 15; English v. State, 31 Fla. 340, 12 South. 689; Donald v. State, 31 Fla. 255; State v. Barker, 10 L. R. A. 50; Carpenter v. State, 4 How. 163; Copp v. Henniker, 55 N. H. 179; State v. Hartley, 22 Nev. 342; State v. McClear, 11 Nev. 39; Stats. 1861, pp. 138, 300, 452; Const. Nev. art. 2, sec. 2; Rosencrantz v. Territory, 2 Wash. Ter. 267; Harland v. Territory, 13 Pac. 453; People v. Lensen, 167 Pac. 406.

The foreman of the grand jury was disqualified from

acting by reason of having formed an opinion that a crime had been committed, that the crime was murder, and that petitioner was the perpetrator of the crime, by his own affidavit, said opinion having been formed prior to and at the time he had the crime under consideration. Rev. Laws, 7005, 7090.

*E. P. Carville,* District Attorney, *Chas. A. Cantwell,* Deputy District Attorney, and *Edwin E. Caine,* for Respondents:

At common law women were not qualified to act as grand jurors, and this common law obtained up to the time of the adoption of the state constitution; but that common law did not continue as an integral part of our law after the adoption of the constitution. "Laws shall be made to exclude from serving on juries all persons not qualified electors." Const. Nev., sec. 27, art. 4; sec. 1, art. 2. The constitutional amendment of 1914 did more than confer the right of suffrage on women. Rev. Laws, 263, 296, 310, 312, 371, 411. The supreme court has upheld the power of the legislature to fix disqualifications of grand jurors without regard to the common-law disqualifications, the logical effect and conclusion being that the common law was not, by virtue of the constitution, controlling in that respect. State v. Millain, 3 Nev. 424.

Legislatures have expressed, by their enactments for the exemption of married women, their assent to the service of women on juries. 26 Am. & Eng. Ency. Law, 712; Sutherland, Stat. Constr., sec. 237; Pomeroy v. Beach, 49 N. E. 370; Parks v. State, 64 N. E. 862; In Re Locust Ave., 77 N. E. 1012; People v. Weinstock, 102 N. Y. Supp. 349; State v. Speigel, 109 N. E. 523; Stiers v. Mundy, 92 N. E. 374; State v. K. C. & M. R. & B. Co., 174 S. W. 248.

The juror objected to was impartial and in all respects qualified. Moreover, bias being merely cause for challenge to the favor, the error of the court, if any, in denying the challenge, is not jurisdictional. The disqualification for bias would not make the indictment

void. Petitioner cannot raise the point in this proceeding. His only remedy would be by appeal. 20 Cyc. 1304.

A minute order postponing the term and excusing the jurors was within the power of the court to make. 20 Cyc. 1317. The objection to the selection of the grand jury by the district judge alone, having been made in this proceeding for the first time, will not be entertained. It was not embodied in the motion to set aside the indictment as presented to the trial court. In making the motion, petitioner expressly avers that the twenty-four persons were selected, but makes no allegation of improper selection. 32 Cyc. 624–626; State v. District Court, 76 Pac. 680; Baughman v. Superior Court, 72 Cal. 572.

By the Court, MCCARRAN, C. J.:

1. This is a proceeding in prohibition. The petitioner was indicted by the grand jury of Elko County, eleven members of this body who participated in the finding of the indictment being men, the other members being women. As a primary contention, petitioner alleges that the indictment is invalid, because under our constitution and laws women are not eligible to serve as members of a grand jury. Section 8 of article 1 of our constitution provides:

"No person shall be tried for a capital or other infamous crime     *     *     *     except on presentment or indictment of the grand jury, or upon information duly filed by a district attorney, or attorney-general of the state."

It is contended by petitioner, and conceded on behalf of respondent, that at common law women were not qualified to sit on a grand jury, and that this rule obtained up to the time of the adoption of our constitution. Conceding this does not, however, preclude us from inquiring as to the class of persons from whom grand jurors were selected at common law, and further inquiring as to how, if at all, we supplanted this class when we adopted the grand-jury system.

In Chitty's Treatise on Criminal Law, vol. 1, p. 306, we are told that at common law all persons serving upon the grand jury inquest must be good and lawful men, "by which it is intended," says the author, "that they must be liege subjects of the king, and neither aliens, nor persons outlawed even in a civil action, attainted of any treason or felony, or convicted of any species of crimen falsi, as conspiracy or perjury, which may render them infamous." Hence we see that the class of persons from whom grand jurors could be selected at common law was those who were liege subjects of the king. By later statutes, the class from whom grand jurors might be selected was fixed as those possessing certain property or income qualifications in addition to their being liege subjects of the sovereign. Section 27, article 4, of our constitution provides, inter alia:

"Laws shall be made to exclude from serving on juries, all persons not qualified electors of this state."

Section 4929, Rev. Laws, being section 1 of an act entitled "An act concerning juries," provides:

"Every qualified elector of the state, whether registered or not, who has sufficient knowledge of the English language, and who has not been convicted of treason, felony, or other infamous crime, and who is not rendered incapable by reason of physical or mental infirmity, is a qualified juror of the county in which he resides, or the county to which it is attached for judicial purposes."

Looking to the creation of a jury list, section 4937, Rev. Laws, provides:

"The board of county commissioners in each county of the State of Nevada, shall, at its first meeting after the approval of this act, and thereafter at its first regular meeting in each year, by an order duly made and entered on its minutes, estimate, as nearly as possible, the number of trial jurors that will be required for attendance on the district court of said county until the next annual selection of trial jurors under this act. The

said board shall thereupon select from the qualified electors of the county, whether registered or unregistered, not exempt by law from jury duty, such number of qualified electors as it has been estimated to be necessary. The names of the electors so selected shall be entered upon the minutes of said board, together with the occupation and place of residence of each of such electors so selected."

Section 4931, Rev. Laws, provides:

"It shall be the duty of the district judge and any one of the county commissioners of the county, at least once in each year and as much oftener as the public interest may require, to select from the jury list twenty-four persons who shall be summoned to appear as grand jurors at such time as the judge may order. * * * If from any cause a sufficient number do not appear, or those who appear are excused or discharged, an additional number, sufficient to complete the grand jury, shall be selected from the jury list by the judge and clerk and summoned to appear in court at such time as the court may direct."

It will be noted that these statutory enactments follow the direction of the constitutional provision. By section 4937 the board of county commissioners are required to select a jury list for the ensuing year, which list shall contain the names of qualified electors only. Section 4931 makes it the duty of the district judge, whether acting with one of the county commissioners or with the clerk of the court, to select the members of the grand jury from this jury list, the names of which have been previously selected by the county commissioners from the qualified electors of the county. Nowhere do the statutory provisions lose sight of the constitutional requisite and direction as to the qualifications of grand jurors, to wit, that they shall be qualified electors. Hence, while it may properly be said that we have taken our grand-jury system from the common law, it must be recognized that the class of persons which the common law declare to be subject to grand-jury duty was,

at the adoption of our constitution, changed, and in its place was substituted a class defined as "qualified electors." So, qualified electorship in grand-jury service holds the same place under our organic law as was held by the term "liege subjects of the king" at common law.

Section 1 of article 2 of our constitution as adopted by our constitutional convention provided that:

"Every white male citizen of the United States (not laboring under the disabilities named in this constitution) of the age of twenty-one years and upwards who shall have actually, and not constructively, resided in the state six months, and in the district or county thirty days next preceding any election, shall be entitled to vote," etc.

By the amendment of 1877, approved and ratified in 1880, the word "white" appearing before the word "male" was stricken out. We mention this amendment because it becomes significant at a later place in our opinion. This section of our constitution, as it now stands after adoption and ratification, reads as follows:

"All citizens of the United States (not laboring under the disabilities named in this constitution) of the age of twenty-one years and upwards, who shall have actually, and not constructively, resided in the state six months, and in the district or county thirty days next preceding any election, shall be entitled to vote. * * * There shall be no denial of the elective franchise at any election on account of sex."

By this last amendment, the right of electorship at any election was accorded to women. Hence any woman of the age of 21 years and upwards, who has actually and not constructively resided in this state six months, and in the district or county thirty days next preceding an election, is a qualified elector, and has the right to vote at any district, county, or state election, providing she has complied with the election laws governing such elections.

It is contended by petitioner that the granting to woman of the right to vote, although the same makes

her a qualified elector, does not thereby clothe her with the privilege or obligation of grand-jury duty. In other words, it is contended that while by the constitutional amendment women are made qualified electors, this does not of itself make them qualified for grand-jury service.

We think that the contention of petitioner has been answered by the courts in those cases where the same contention was raised following the adoption of the fourteenth and fifteenth amendments to the federal constitution. The enactment of the fourteenth and fifteenth amendments gave citizenship and the privileges of citizenship to persons without regard to race, color, or previous condition of servitude. The adoption of the fourteenth and fifteenth amendments rendered inoperative the provisions in the organic law of the several states whereby the right of suffrage was limited to the white race. The question of the right of members of the colored race to serve as jurors where a statute confined the selection of jurors to persons possessing the qualifications of electors, and where such was limited to the white race, was dealt with by the Supreme Court of the United States in the case of Neal v. Delaware, 103 U. S. 370, 26 L. Ed. 567, and in the opinion of that court, rendered by Mr. Justice Harlan, it was held that though no constitutional amendment had been adopted by the State of Delaware conforming to the fifteenth amendment, nevertheless by operation and by force and effect of the federal amendment a statute confining the selection of jurors to persons possessing the qualifications of electors was enlarged in its operation so as to embrace all those who by the constitution of the state, as modified by the federal amendment, were entitled to vote. To the same effect was the case of Strauder v. West Virginia, 100 U. S. 303, 25 L. Ed. 664. The question was again dealt with by the Supreme Court of the United States in the case of Bush v. Kentucky, 107 U. S. 110, 1 Sup. Ct. 625, 27 L. Ed. 354.

To the suggestion that in adopting the grand-jury

system we adopted such system as it was known and as it existed at common law, it may be said, conceding that we adopted the system itself, or rather the principle of the grand-jury system, from the common law, that when we incorporated the system into our laws we departed most emphatically from the lines which established grand-jury qualifications at common law, for under the ancient system, not only must a grand juror have been a liege subject of the king, but the venire facias prescribed that they be liber et legalis homo. Chitty reminds us that the regulation was that they be freemen or freeholders, and later statutes of England fixed a more restricted latitude from the standpoint of property qualifications, thus:

"That every man between the ages of twenty-one and sixty years, residing in any county in England, who shall have in his own name, or in trust for him, within the same county £10 by the year above reprizes, on lands. or tenements, whether of freehold, copyhold, or customary tenure, or of ancient demesne, or in rents issuing out of any such lands or tenements, or in such lands, tenements, and rents, taken together, in fee simple, fee tail, or for the life of himself or some other person, or who shall have within the same county £20 by the year above reprizes, in lands or tenements, held by lease or leases, for the absolute term of twenty-one years, or some longer term, or for any term of years determinable on any life or lives, or who, being a householder, shall be rated or assessed to the poor rate, or to the inhabited house duty in the county of Middlesex, on a value not less than £30, or in any other county on a value not less than £20, or who shall occupy a house containing not less than fifteen windows, shall be qualified, and shall be liable to serve on juries for the trial of all issues in the civil and criminal courts, such issues being respectively triable in the county in which every man so qualified respectively shall reside, and shall also be qualified and liable to serve on grand juries, in courts of sessions of

the peace, and on petty juries, for the trial of all issues joined in such courts of sessions of the peace and triable in the county riding, or division, in which every man so qualified respectively shall reside."

How far we departed from all of these qualifications as prescribed and recognized at common law may be measured at a glance when by our organic law we expressly declared that the basis of exclusion from service on juries, so far as their primary selection was concerned, was the lack of qualified electorship. Constitution of Nevada, art. 4, sec. 27. It may be urged that at the time of the framing of our organic law, qualified electorship was not considered as being attributable to women. But time has wrought the unanticipated change, and by amendment to our constitution women have been clothed with the qualification of electorship, and by this change the female citizens of the state have automatically become members of the class from which class alone grand jurors may be drawn, and which classification, as established by the organic law, constitutes the only circumscription defining, limiting, and fixing the citizenry from which grand jurors might be in the first instance selected.

Blackstone tells us that the term "homo," though applicable to both sexes, was not regarded in the common law, applicable to the selection of grand jurors, as embracing the female. Woman, he says, was excluded propter defectum sexus. The right of electorship is by our laws made incident to the right, duty, and privilege of grand-jury service. It is the basis of grand-jury selection. To say that women, after being empowered with the right of electorship, were nevertheless excluded from grand-jury service, would be to say that, although the organic law made electorship the basis of grand-jury service, there was nevertheless within the body of the electorate a class excluded from grand-jury service, the only basis for this exclusion being, as Blackstone puts it, propter defectum sexus. When the people of Nevada approved and ratified the constitutional amendment

making women qualified electors of the state, it is to be presumed that such ratification carried with it a declaration that the right of electorship thus conferred carried with it all of the rights, duties, privileges, and immunities belonging to electors; and one of the rights, one of the duties, and one of the privileges belonging to this class was declared by the organic law to be grand-jury service. Nor can we with any degree of logical force exclude women from this class upon the basis established by Blackstone, propter defectum sexus, because we have eliminated the spirit of this term from our consideration of womankind in modern political and legal life. Woman's sphere under the common law was a circumscribed one. By modern law and custom she has demanded and taken a place in modern institutions as a factor equal to man. She may own and enjoy property, on which she may be taxed for maintenance of government. She may enjoy equal educational rights and privileges. She may exercise the right of citizenship and cast her vote for public servants. She may be an elector or she may be elected to public office of honor, trust, and responsibility. The grand jury, whatever its ancient functions may have been, has under modern law become an institution endowed largely with inquisitorial powers. Not only does it have to do with criminal investigations, but by statutory provision it may inquire into the affairs, conduct, and regulation of public offices, boards, and commissions. The public health and public welfare, as well as the moral atmosphere of a community, are matters of proper inquiry for our modern grand jury. Can we reasonably say that although woman, on whom has been conferred the right of electorship, the right to enjoy public office, the right to own and control property, and on whom has been imposed the burden of taxation in a common equality with men, is nevertheless deprived of the privilege of sitting as a member of an inquisitorial body, the power, scope of inquiry, and significance of which affects every department of life in which she, as a citizen and elector,

is interested and of which she is a component part? The spirit of the constitutional amendment silences such an assertion.

It was the grand-jury system as an institution that we adopted from the common law, but in adopting this institution we specifically changed the qualification of the class from which grand jurors should be selected. Had we adopted the institution without designating or making mention of the qualifications of grand jurors, then indeed it might with some force be argued that in adopting the institution we adopted it in its entirety as it existed at common law. Section 5 of article 4 of our constitution provides:

"Senators and members of the assembly shall be duly qualified electors in the respective counties and districts which they represent," etc.

Section 3 of article 5 of the constitution provides:

"No person shall be eligible to the office of governor, who is not a qualified elector," etc.

Section 19 of article 5 provides:

"A secretary of state, a treasurer, a controller, a surveyor-general, and an attorney-general shall be elected at the same time and places and in the same manner as the governor. * * * Any elector shall be eligible to either of said offices."

Section 3 of article 15 of our constitution provides:

"No person shall be eligible to any office, who is not a qualified elector under this constitution. * * *"

Section 1 of article 18 provides:

"The rights of suffrage and office holding shall not be withheld from any male citizen of the United States by reason of his color or previous condition of servitude."

It will be noted that the last-mentioned section specifically puts office holding in the masculine. Shall it be said that, notwithstanding the amendment to our constitution which gives to woman the right of suffrage and electorship, these last-mentioned sections of the organic law would have to be amended to entitle women

to the right of office holding in this state? It is said, by way of argument, that when our constitutional convention incorporated the section providing for the grand-jury system in this state it implied that members of that body should be males. The same argument might with the same degree of consistency be put forth in further-ance of the assertion that when the framers of our constitution adopted the sections last named, none but males being then eligible to electorship, they impliedly declared that none but males should enjoy the right to hold the several offices established. Such a contention would scarcely gain the sanction of reason, nor would such be supported by the rules of statutory or constitu-tional construction with which we are familiar.

Qualified electorship is the primary basis of the right to hold public office. Qualified electorship is the pri-mary basis of the right or duty of jury service. It is conceded that by the amendment to our constitution entitling women to the right of electorship the sections of the constitution which makes electorship the basis of office holding were impliedly amended so as to make women equally eligible. This can only be true because qualified electorship impliedly carried with it the right and privilege of the enjoyment of public office. But qualified electorship carries with it the right, privilege, and duty of jury service, and the rule which injects the force of the constitutional amendment into the sections of the constitution making none but qualified electors eligible to office must with equal force affect that pro-vision of the constitution making none but qualified electors eligible to jury duty. It is not a certain class of qualified electors who are eligible to jury duty, but all qualified electors.

While it may be of minor significance, it is, we think, worthy of note that the legislature of this state has regarded women as being subject to jury duty, and in an amendment to the jury laws providing for additional exemption from jury duty, passed by the legislature of

1915 and approved on March 6 of that year, we find it specifically provided that married women may claim exemption from jury service. Stats. 1915, p. 84; Stats. 1917, p. 32.

We note the decision of the Supreme Court of Washington Territory in the case of Harland v. Territory, 3 Wash. T. 131, 13 Pac. 453. In the last-mentioned case the decision of the majority of the Supreme Court of Washington in the case of Rosencrantz v. Territory, 2 Wash. T. 267, 5 Pac. 305, was overruled by a divided court. In the Rosencrantz case, Judge Turner, who wrote the opinion in the Harland case, dissented, and, the personnel of the court having changed in the interim, his dissenting opinion became the prevailing opinion in the Harland case. Neither the reasoning of Judge Turner's opinion nor the rule in that case is of assistance to us here. Indeed, the question determined in both of the latter cases was entirely different from that which confronts us here. There a code provision (section 2078) was before the court, wherein it was declared:

"All qualified electors shall be competent to serve as petit jurors, and all qualified electors and householders shall be competent to serve as grand jurors."

The decisions of the Washington court did not turn on the question of qualified electorship, because at that time (1884–1887) women did not possess the right of electorship under the Washington laws. Both of the decisions mentioned rather turned on the question of the qualification of a married woman to serve as a juror under the language of the Washington code providing that householders should be competent for such service. No such question confronts us here. The sole qualification for grand jurors made by our constitution and by the laws enacted thereunder is qualified electorship, and we can do naught else than conclude that, in view of the fact that women, having been enfranchised by the amendment to our constitution, may therefore become qualified electors, as such they are privileged to and subject to jury duty.

We take guidance from the decisions of this court in

the cases of State v. McClear, 11 Nev. 39, and State v. Hartley, 22 Nev. 342, 40 Pac. 372, 28 L. R. A. 33, because of the profound learning there displayed by our eminent predecessors; but if these cases furnish any light on the question at bar, such only serves to illuminate the position which we take. In neither of these cases is there a single assertion decisive of the one question presented in this phase of the case. Not only is the adoption of the grand-jury system from the common law recognized and conceded in our views, but we concur in the views expressed in both the McClear and Hartley cases, and would cite them approvingly in support of our position.

2. A second contention is made by petitioner here upon which relief by prohibition is asked from this court. In this respect it is asserted that J. H. Cazier, the foreman of the grand jury which returned the indictment, was disqualified under clause 6 of section 155 of the criminal practice act (Rev. Laws, 7005). This section provides:

"A challenge to an individual grand juror may be interposed for one or more of the following causes only:

"1. That he is a minor;

"2. That he is an alien;

"3. That he is insane;

"4. That he is a prosecutor upon a charge against the defendant;

"5. That he is a witness on the part of the prosecution, and has been served with process or bound by an undertaking as such;

"6. That a state of mind exists on his part in reference to the case, or to either party, which will prevent him from acting impartially and without prejudice to the substantial rights of the party challenging; but no person shall be disqualified as a grand juror by reason of having formed or having expressed an opinion upon the matter of cause to be submitted to such jury, founded upon public rumor, statements in public journals, or common notoriety; *provided,* it satisfactorily appears to the court upon his declaration, under oath,

or otherwise, that he will, notwithstanding such an opinion, act impartially and fairly upon the matters to be submitted to him."

Attached to the affidavit of petitioner's counsel there is set forth the interrogatories propounded by petitioner and by the state to the juryman J. H. Cazier. This examination took place after the finding of the indictment. It is disclosed that the juryman testified that he had seen an account of the case of State of Nevada v. Arne W. Parus, as the same was published in the newspapers; that he had heard the case talked of, but not in detail; that he had not talked with any of the members of the grand jury relative to the case. He was interrogated, and answered thus:

"Q. From what you had read and from what you had heard about this case, had you formed or expressed any opinion concerning the guilt or innocence of Mr. Parus? A. Why I don't know that I have; no. I have heard it spoken of and regretted, and I have heard people say, and I don't know but what I have myself expressed regret that such a thing would happen, and that is about all.

"Q. You hadn't any opinion, prior to the time that you took up the consideration of this case, as to whether a crime had been committed or not, and as to whether Mr. Parus had committed such a crime? A. Well, I believe from what I had heard that I did consider a crime had been committed; I believe that was the——

"Q. And that Mr. Parus was the party who had committed it? A. Yes; that is, through just what I had heard; I felt like a crime had been committed; yes, I admit it.

"Q. And that was prior to the time that you took up the consideration of this case as a grand juror? A. Well, yes, I might say that, but I hadn't paid very much attention to it, not knowing the party; but I think, perhaps, I was impressed with what I had heard; that a crime had been committed; yes, sir.

"Q. Well now, that opinion that you had, was that a

fixed, settled opinion, one that would require evidence
to remove?  A. Well, I don't know that it was; I don't
know that it was.  If the evidence was conclusive that
there hadn't been a crime, why, I would decide it by the
evidence.

"Q. But you were in that state of mind, were you
not, Mr. Cazier, at that particular time, which would
require evidence to have changed that opinion?  A.
Well, I don't know but what it would, yes.  I felt like
a crime had been committed, and of course we, after the
case was submitted and the particulars were known,
why, I felt like we were justified in finding——

"Q. Now, as I understand it, at that time and before
the witnesses were called and sworn in that case before
the grand jury, as I understand it, your mind was in
that condition that it would have required evidence to
remove the opinion that you had as to the guilt of Mr.
Parus?  A. That might possibly have been the case.

"Q. Well, now, wasn't it the case?  A. I hadn't
thought very much about it, as I tell you, but I felt like
a crime had been committed; yes, I admit that, some
crime.

"Q. And it would have at that time, before you heard
a word of testimony, it would have required evidence to
have removed that opinion, wouldn't it?  A. Possibly,
yes.

"Q. Well, wouldn't it?  A. Well, I hadn't thought
about it that way, Judge; I don't know; I hadn't
thought about it.  I thought a crime had been com-
mitted of course; from what I had heard and what I
had seen in the papers, I thought a crime had been
committed, but I hadn't thought about the evidence, and,
in fact, I didn't know whether it would be submitted to
this jury or not.  I hadn't thought about it much prior
to the time it came before the jury.

"Q. Well, now, Mr. Cazier, if you were to have been—
if it were a question of your being chosen as a trial juror
and you were being examined upon your voir dire, and
you had been asked if you felt that you would have been

a—would be an impartial juror, wouldn't your answer have been, 'No, I don't think I would make an impartial juror in this case?' A. No, judge; I couldn't say that. If I had been examined as a trial juror I believe I would have given the defendant a fair and impartial trial. That is the way I felt; I had no prejudice; I didn't know the man, and I don't have any distinct recollection of being introduced to Mr. Winter.

"Q. But at that particular time you did have such information respecting this matter that you were satisfied in your own mind that Mr. Parus was guilty of the offense charged? A. Yes; I felt like he was guilty of the offense charged, because—or he was, from what I had heard——"

On cross-examination, the juror, Cazier, described his state of mind thus:

"Q. As I understand, Mr. Cazier, the only idea you had of this case, before it was presented to you as a grand juror, was gleaned from newspaper reports and a little casual talk, is that right? A. Yes, I—that was what I based my belief on, of course; that is the only thing I could; I didn't have anything else.

"Q. Did you talk, at any time prior to the time this matter was presented to you in the grand-jury room, to any one who was a witness in any way in this case? A. No, I think not. I don't think I ever met any of the witnesses, not that I recall now.

"Q. What you heard, then, was in the form of this public rumor going around, was it? A. Yes.

"Q. And the rest of it was from the articles that were published in the local papers here? A. Yes. I picked up the local paper in the window and noticed it, and then I, after coming up here, I heard it mentioned, I couldn't say by whom either now; I have heard it mentioned though; that is about all. I don't know that I have discussed it with anybody, any more than just to mention the fact that the crime had been committed, or the supposition was that a crime had been committed.

"Q. And from that talk that you heard and from those newspaper reports, you formed a certain impression, which was based upon the facts as related in the newspapers? A. Well, yes—well, I don't know that I based any opinion.

"Q. Now, was that impression that you formed in the nature of an opinion as to the guilt or innocence of Arne Parus of the crime of murder? A. Well, I knew that he was the accused; that is all I knew, through the paper, that he was the accused, and I hadn't paid much attention. I don't know anything about the details or the circumstances surrounding the killing; of course I couldn't determine whether it was murder or justifiable homicide or what you would call it; I felt like a crime had been committed.

"Q. And yet you feel that prior to the time that you heard the evidence in the grand-jury room you would have been fully qualified as a trial juror in the case? A. Yes; I felt like I could have given the defendant a fair and impartial trial. I had no fixed convictions as to his guilt or innocence, because I didn't know the circumstances."

The juryman was interrogated at greater length, and was cross-interrogated, but we find nothing in his examination which would indicate that at the time at which he became a member of the grand jury, and prior to the time at which that body undertook the investigation of the case, he was possessed of a state of mind which would prevent him from acting impartially and without prejudice to the substantial rights of petitioner. There is nothing in the record from which we might infer that the impression or opinion held by the grand juror was other than one which, if formed at all, was based on public rumor and what he had read in the current newspapers. The record as it is before us fails to bring the juror within the rule which under our statute would preclude him from serving on the grand jury prior to the investigation of the case of petitioner.

This is especially true in view of the language of subdivision 6 of section 7005 quoted, by which it is made plain that it is not every opinion or impression formed that will preclude a juror from acting in a case. The opinion which will disqualify must be one based on something more substantial and tangible than mere rumor or the report of current publications. It must be more deep-seated and substantial than a vague general opinion of the existence of a public offense.

3. A third ground is urged here why this writ should issue. In this respect it is contended that the accusatory body which brought in the indictment against petitioner was not selected by the officers prescribed by law, but was selected by the district judge acting alone. From the record as it is before us, it appears that the members of the grand jury were selected by the district judge and one member of the board of county commissioners. From all that we may ascertain from the record, there appears to have been a substantial compliance with the statutory requirements in this respect. Rev. Laws, 4931. It is not every technical defect in a proceeding of this character that will vitiate the acts of the officers in drawing the grand jury. Where in drawing, summoning, and impaneling the jury there is a substantial compliance with the statute on the part of the designated officers, and where this compliance indicates freedom from bias or prejudice, the courts are not inclined to set aside indictments found after due deliberation on the part of the grand jury, where everything indicates fair and impartial consideration. The whole contention of petitioner relative to this phase is met squarely by the decision of this court in the case of State v. Collyer, 17 Nev. 275, 30 Pac. 891.

The writ prayed for should be denied, and the proceedings dismissed.

It is so ordered.

SANDERS, J.: I concur.

COLEMAN, J., dissenting:

I regret that I am unable to reach the conclusion set forth in the majority opinion as to the qualification of women to do grand-jury duty, for I feel that their service upon our grand juries would greatly tend to produce a more wholesome moral atmosphere within the various counties of the state; but sentiment must not be permitted to enter into the consideration of those matters.

I shall not elaborate in the presentation of my views. In the adoption of our constitution, while it is provided by section 6, article 1, that "No person shall be tried for a capital or other infamous crime   *   *   *   except on presentment or indictment of a grand jury,   *   *   *" the constitution nowhere says, in express words, who shall comprise the grand jury. It is contended by petitioner, and conceded by respondents, that at common law only men were qualified to sit on a grand jury, and that this rule obtained up to the time of the adoption of our constitution. It must be presumed that the constitutional convention, in providing that indictments might be found by a grand jury, contemplated a grand jury composed of members possessing the qualifications required of grand juries at common law. The general rule is laid down in 8 Cyc. p. 740, as follows:

"Constitutions themselves, being instruments in the nature of reenactments of an acknowledged system of principles coeval with, and a part of, the common law itself, and subject to judicial interpretation from their inception, it necessarily follows that the definitions of terms used in constitutions and statutes are to a great extent to be found in the common law and in the common usage and understanding of these terms according to the institutions of the country in which they originated and were brought into use in the administration of governments."

Mr. Cooley, in his work on Constitutional Limitations (6th Ed.) p. 73, says:

"It is also a very reasonable rule that a state constitution shall be understood and construed in the light and by the assistance of the common law, and with the fact in view that its rules are still left in force. By this we do not mean that the common law is to control the constitution, or that the latter is to be warped and perverted in its meaning in order that no inroads, or as few as possible, may be made in the system of common-law rules, but only that for definitions we are to draw from that great fountain, and that, in judging what it means, we are to keep in mind that it is not the beginning of law for the state, but that it assumes the existence of a well-understood system which is still to remain in force and be administered, but under such limitations and restrictions as that instrument imposes."

In the case of Carpenter v. State, 4 How. (Miss.) 163, 34 Am. Dec. 116, the court says:

"It is a general rule that, where terms used in the common law are contained in a statute or the constitution, without an explanation of the sense in which they are there employed, [they] should receive that construction which has been affixed to them by the former. To ascertain then in what the right of trial by jury consists, we must necessarily recur to the provisions of the common law defining the qualifications, and ascertaining the number of which the jury shall consist; as the standard to which, doubtless, the framers of our constitution referred. At common law the number of the jury, for the trial of all issues involving the personal rights and liberties of the subject, could never be less than twelve; though there are some precedents which show that a verdict by a greater number would not, on that account, be void. The legislation of the state has left this particular topic untouched. It has in no instance prescribed the number of the jury, if it were at all important for it to have done so; but in all cases where the term 'jury' is used in our statutes, it is regarded as one of fixed and determined meaning, ascertained by the paramount law."

In at least two cases this court has determined that such is the rule in this state, and while the opinions are instructive, it is not deemed necessary to comment upon them or to quote from them at length. In the case of State v. McClear, 11 Nev. 39, HAWLEY, C. J., considers at length the constitutionality of an act in which the court discussed a question similar to the one here involved, and, to my mind, used language decisive of this matter. Said the court:

"It was claimed upon the oral argument that the constitutional provision only requires a jury of twelve men. That the number is all that is essential. We must confess that this appears to have been the view entertained by the legislature in the passage of the amended act. If this be true, it would be within the power of the legislature to take away all the other qualifications without violating any of the provisions of the constitution, and the right of trial by jury—so long esteemed as the palladium of our liberties—if such power was exercised, would soon dwindle into insignificance and become a byword and reproach upon our entire judicial system. * * * We think that the term 'jury,' as it is used in the constitution, means twelve competent men who are free from all the ties of consanguinity and all other relations that would tend to make them dependent on either party. It means twelve men who are not interested in the event of the suit, and who have no such bias or prejudice in favor of, or against, either party as would render them partial toward either party. These, among others, are the general definitions which we consider are guaranteed by the constitution."

I think the learned jurist used the word "men" advisedly.

In the case of State v. Hartley, 22 Nev. 342, 40 Pac. 372, 28 L. R. A. 33, in which was involved the constitutionality of an act which provided that twelve persons should be summoned to appear as grand jurors, of which number the court should select ten persons to constitute the grand jury, the court considered the question at

some length, but a brief quotation will suffice as follows: "At the time of the adoption of the constitution of Nevada, wherein it is declared 'No person shall be tried for a capital or other infamous offense  *  *  *  except on presentment or indictment of a grand jury' (art. 1, sec. 8), the provisions of the General Statutes (secs. 3795, 4106, 4107) which are declaratory of the common law were in force, being enacted by the territorial legislature of 1861. *We, therefore, conclude that, when the people of this state adopted this constitutional provision, they had in view a 'grand jury' as it existed at common law* and under the statutes at the time of the adoption of the constitution. It is so held by this court with reference to the right of trial by jury in construing the third section of the same article of the constitution. State v. McClear, 11 Nev. 39. The reasoning in that case is applicable to the question at bar." (Italics ours.)

If the law quoted is sound, as I think it is, then our constitutional convention provided for a grand jury of *men* as clearly as though the constitution itself had used the word "men." The word "men" is written into the constitution by operation of law. What is the difference, in legal effect, between its being written in by operation of law and its being expressly incorporated therein? Absolutely none. Had the constitution provided in express terms that no person should be tried except on presentation or indictment of a grand jury composed of *men*, we would not now be called upon to determine this question. Yet there is no difference between using the word "men" and adopting a system which existed at common law from which all but men were excluded. To my mind, the proposition is too clear and simple to justify argument.

But is is said that section 27, article 4, of the constitution, which provides that "laws shall be made to exclude from serving on juries, all persons not qualified electors,  *  *  * " in effect imposes jury duty upon all qualified electors, and when our constitution was so amended as to confer the right of suffrage upon women,

jury duty was automatically imposed upon them. To my mind, the portion of section 27, article 4, quoted, is one of exclusion and not one of inclusion. There is, as I view it, a wide difference between a statute or constitutional provision which imposes jury duty upon a class of persons and one which excludes all other persons except a certain designated class. Yet the section mentioned is one of exclusion only. In any event, conceding the contrary view, it would be a case of harmonizing the two sections of the constitution; and if my view is correct, the adoption of a grand jury system composed of *men* would not be in the least nullified by such a section as section 27, article 4, as it in no way conflicts with the view that the grand jury should be composed of *men*.

If my assumption that the constitution adopted the common-law grand-jury system is correct, it is clear that the statutory provisions relative to the selection of grand jurors are of no assistance to us in determining the main question involved; for otherwise, should the Bolsheviki get control of our legislature, the entire fundamental law of our state would be wiped out within thirty days from their meeting.

Nor am I willing to concede that the decision in Neal v. Delaware, 103 U. S. 370, 26 L. Ed. 567, and similar cases in that court, are authority holding a contrary view. Those were cases wherein it was urged that the exclusion of persons of the African race from jury duty, under a constitutional provision of Delaware which restricted the selection of jurors to *white* male persons, was in violation of the fourteenth amendment to the constitution of the United States. The fourteenth amendment provides that:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States. * * * "

But is has never been contended that the fourteenth amendment conferred all the privileges of citizenship upon women, for if such were the effect, it would seem that it would not have been necessary to amend our constitution to confer the elective franchise upon women, nor would it be necessary to now amend the federal constitution, as is sought to be done, to confer the right upon them. The words of Mr. Justice Field, in Ex Parte Virginia, 100 U. S. 365, 25 L. Ed. 676, are of force in this connection, wherein he says:

"But the privilege or the duty, whichever it may be called, of acting as a juror in the courts of the country is not an incident of citizenship. Women are citizens; so are the aged above 60, and children in their minority; yet they are not allowed in Virginia to act as jurors. Though some of these are in all respects qualified for such service, no one will pretend that their exclusion by law from the jury list impairs their rights as citizens."