## STATE v. JOE E. DALTON.

### (Filed 2 May, 1934.)

**1. Indictment A b—Grand jury drawn under prior act held properly constituted, later act being effective after date for selecting jury.**

C. S., 2334, 2314, 2333, providing that grand juries for the counties affected should be chosen for six months at the first terms of court for the fall and spring terms, were made applicable to the county in question by Public Laws of 1931, chap. 131. Thereafter Public Laws of 1931, chap. 131, was repealed and C. S., 2334, was amended to provide that the grand juries for the county in question should be drawn at the spring term to serve for twelve months, Public Laws of 1933, chap. 92. The amendment went into effect in 1933 subsequent to the first spring term of the county in question and defendant was tried on an indictment returned by a grand jury chosen for the fall term under the act of 1931: *Held*, the indictment was returned by a duly constituted grand jury, and defendant's exception relating thereto cannot be sustained, the "spring term" referred to in the act of 1933 meaning the first spring term, and the amendment, therefore, not being effective for the year 1933.

**2. Jury B d: Criminal Law L c—In absence of request for finding of facts it will be presumed that order is supported by proper findings.**

Where defendant makes no request for a finding that the trial would likely be protracted, it will be presumed on appeal that the court's order for an alternate juror is supported by sufficient findings of fact.

**3. Jury B d: C b—Act providing for alternate juror where it seems likely that trial will be protracted is constitutional.**

The essential attributes of trial by jury guaranteed by Art. I, sec. 13, are the number of jurors, their impartiality and a unanimous verdict, and chap. 103, Public Laws of 1931, providing that the court may order the selection of an alternate juror in those cases which seem likely to be protracted, does not infringe upon the constitutional provisions, the alternate not being technically a juror until a member of the jury has died or been discharged and the alternate is made a juror by order of the court, and the alternate being selected in like manner with the regular jurors and having the same safeguards thrown around him and being given equal opportunities with them of hearing the case, and his presence not being prejudicial, and the verdict being finally returned by unanimous verdict of twelve good and lawful men.

**4. Jury B d—**

Where the court finds that one of the regular jurors was sick and incapacitated it is sufficient to support his order that the alternate juror selected in the case should serve as a juror.

**5. Homicide G c—Held: foundations for admissibility of testimony of deceased's dying declarations were sufficiently laid.**

Testimony that deceased had been shot and was in imminent danger of death and had repeatedly stated that she thought she was going to die,

and that she did die less than a week thereafter, is sufficient to support testimony of declarations made by her of circumstances directly attending the homicide and forming a part of the *res gestœ*, it not being necessary that declarant should die immediately after making such declarations, it being sufficient if declarant is in imminent danger of death, apprehends such danger, and that death ensue.

**6. Same—**

Testimony of dying declarations cannot be extended to declarations of acts antecedent and unrelated to the act causing death.

**7. Criminal Law L e—**

Where defendant has testified to conversations he had with deceased some time prior to the fatal shooting, the admission of testimony of declarations made by 'deceased relating to the same conversations will not be held prejudicial.

**8. Same—**

The inadvertent admission of incompetent evidence which does not in any view prejudice defendant will not be held sufficient ground for a new trial.

**9. Homicide H c—Instruction in this case upon element of malice held not to contain reversible error.**

In this prosecution for murder, defendant's exception to the charge of the court to the jury on the ground that it failed to instruct the jury that they must find that the element of malice existed in the mind of defendant at the time of the killing in order to convict him of murder in the first degree, is not sustained, it appearing from the record that the court fully and accurately charged the jury upon the element of malice immediately after instructing them upon the elements of premeditation and deliberation and charged them that it might be said to exist where there is an intentional and unlawful killing of a human being without lawful excuse or mitigating circumstances.

**10. Criminal Law I g—**

The correction by the court of an inadvertent statement of the testimony in his charge to the jury with proper instructions will not be held for error.

APPEAL by prisoner from *Schenck, J.,* at October Term, 1933, of HENDERSON. No error.

The prisoner was indicted for the murder of his wife, Zula Dalton, and from a sentence of death pronounced upon a verdict for murder in the first degree he appealed, assigning error.

There is evidence tending to show not only that the prisoner was given to the habitual use of liquor and drugs but that he was a man of immoral character. He had been arrested on sundry charges of crime, including liaison with a woman named Jones. His wife had refused to live with him. On Sunday, 28 May, 1933, she was at the home of Mrs.

H. K. Duncan, one block from Main Street in Hendersonville. In the afternoon Mrs. Duncan and Mrs. Dalton went to ride in the former's car, Mrs. Dalton driving. On the highway leading to Asheville at a place referred to as Strawberry's, about two miles from Hendersonville, the prisoner passed them in a car driven by George Whitaker. In a few minutes he and Whitaker returned to Strawberry's and in an interview with his wife he learned that she would probably never live with him again. In the car driven by Whitaker he returned to Hendersonville, bought a pistol from one man and cartridges from another under the false representation that he was required as an employee of the State Highway Commission to carry such a weapon.

Armed with the pistol, which was loaded and ready for use, he sought his wife at Mrs. Duncan's about seven o'clock in the evening. He went into the sitting room there, called his wife out, took her into the yard. "Just in a second" his wife was heard to exclaim, "Oh Joe, please quit that. Joe, please don't do that." A shot was fired; then "several rapid shots." Mrs. Duncan ran out screaming and saw the prisoner firing the shots. Mrs. Dalton fell to the ground, "stretched out as if dead," and the prisoner came up near her shoulder, fired the pistol, stepped off, put the weapon to his head, "snapped the gun and walked off." Mrs. Dalton was taken to a hospital and the attending physician found a wound at the base of the skull, one through the scapula of the right shoulder and another through the shoulder. She died on the following Sunday morning. The wound at the base of the brain caused her death.

The defense was insanity induced by continuous and excessive use of whiskey and morphine. The prisoner said he had bought the pistol to take his own life. He testified, "I do not remember going to the home of Mrs. Duncan on Barnwell Street or getting out of the car or knocking at the door or seeing Mrs. Roberts. In fact, I do not remember being there at all or asking my wife to go outside with me, or pulling out a pistol and shooting her, or going back to the car. I do not remember going to the county jail or entering the jail. I do not remember seeing those in jail heretofore named, to wit, Otis Powers, Ed Bishop, Zeb Corn, and others. The first thing I remember after leaving Strider's house was Monday morning. I discovered that I was in jail." There was evidence in contradiction.

Such additional facts as are necessary are referred to in the opinion.

*Attorney-General Brummitt and Assistant Attorney-General Seawell for the State.*

*Redden & Redden and R. L. Whitmire for prisoner.*

STATE *v.* DALTON.

ADAMS, J. Upon his arraignment the prisoner moved to quash the indictment on the ground of illegality in the organization of the grand jury, and excepted to the court's denial of his motion.

By an act ratified on 18 March, 1931, section 2334 of the Consolidated Statutes was made applicable to Henderson County. Public Laws, 1931, chap. 131. It was thereby provided that at the first fall and spring terms of the criminal courts grand juries should be drawn to serve respectively during the remaining fall and spring terms—that is, for a term of six months. A panel was to be drawn from the jury box at least twenty days before each regular or special term of the Superior Court and a grand jury was to be drawn except at terms which were special or confined to the trial of civil cases. C. S., 2314, 2333. In compliance with section 2314 a jury was drawn to serve at a term commencing on 9 October, 1933, and from these jurors was chosen a grand jury by whom the indictment in the present case was found and returned.

At the session of 1933 the General Assembly repealed chapter 131, Public Laws, 1931, and amended section 2334 by providing that a grand jury should be drawn at the spring term of the criminal court of Henderson to serve for twelve months. Public Laws, 1933, chap. 92. The phrase "spring term of the criminal court" obviously refers to the first spring term. The first spring term of 1933 for the trial of civil and criminal actions in Henderson County convened on 16 January. C. S., 1443. Chapter 92, *supra,* went into effect 2 March, 1933, and did not in any respect affect the organization of the grand jury that had previously been chosen. Nor did it have any relation to the grand jury which was constituted in the fall. Section 2334 provides that grand jurors chosen to serve for twelve months shall be drawn "at the spring term of the criminal court," the first spring term succeeding the enactment of chapter ninety-two. The prisoner's construction of these acts would result in the abolition of all courts held in Henderson County in the fall of 1933, and this evidently was not the intention of the General Assembly. In the denial of the motion to quash there was no error.

The second, third, and twenty-ninth exceptions are addressed to the selection of an "alternate" juror. The statute empowers the judge presiding in the Superior Court, when it appears that the trial is likely to be protracted, to direct, after the jury is impaneled, that an additional or alternate juror be selected, sworn, and seated near the jury and given equal opportunity to see and hear the proceedings. The alternate juror must be kept with the jury, must at all times attend upon the trial, and must obey all orders and admonitions given by the court to the jury; and if before submission of the case to the jury a juror dies or becomes incapacitated or disqualified, the alternate juror

by order of the judge shall become one of the jury and shall serve as if selected as an original juror. Public Laws, 1931, chap. 103.*

After the jury had been impaneled, G. D. Davis under an order of the court was drawn as alternate juror and was sworn and impaneled in like manner with the other jurors to serve, however, only in case of necessity. At the conclusion of the charge and before the jury had retired for deliberation, the court made the following entry: "It having been made to appear to the court that the juror Thomas Mabry is sick and incapacitated, the alternate juror, G. D. Davis, is placed in his stead."

Upon exceptions duly noted the prisoner assails this proceeding as unconstitutional and as unsupported by sufficient findings of fact. The latter assignment, we presume, has reference to the omission of a preliminary finding that the trial would likely be protracted. There was cause to believe that the trial would be protracted. It began on Wednesday and continued until the following Sunday; and as no request for such finding was made by the prisoner we must assume upon authoritative decisions that the order was based upon such facts as are essential to its support. *Commissioner of Revenue v. Realty Co.,* 204 N. C., 123; *S. v. Harris, ibid.,* 422; *Holcomb v. Holcomb,* 192 N. C., 504.

---

*"Section 1.  That in the trial in the Superior Court of any case, civil or criminal, when it appears to the judge presiding that the trial is likely to be protracted, upon direction of the judge after the jury has been duly impaneled and sworn, an additional or alternate juror shall be selected in the same manner as the regular jurors in said case were selected, but each party shall be entitled to two peremptory challenges as to such alternate juror; such additional or alternate juror shall likewise be sworn and seated near the jury, with equal opportunity for seeing and hearing the proceedings and shall attend at all times upon the trial with the jury and shall obey all orders and admonitions of the court to the jury and, when the jurors are ordered kept together in any case, said alternate juror shall be kept with them.  Such additional or alternate juror shall be liable as a regular juror for failure to attend the trial or to obey any order or admonition of the court to the jury, shall receive the same compensation as other jurors, and except as hereinafter provided shall be discharged upon the final submission of the case to the jury.  If before the final submission of the case to the jury a juror becomes incapacitated or disqualified he may be discharged by the judge, in which case, or if a juror dies, upon the order of the judge said additional or alternate juror shall become one of the jury and serve in all respects as though selected as an original juror.

Section 2.  That all laws and clauses of laws in conflict with the provisions of this act are hereby repealed.

Section 3.  That this act shall be in full force and effect from and after July first, one thousand nine hundred and thirty-one.

Ratified this 13 March, A.D. 1931."  Pub. Laws, 1931, chap. 103.

It is argued that the proceeding is unconstitutional because the act of 1931, which provides for an alternate juror, is forbidden by the Declaration of Rights: "No person shall be convicted of any crime but by the unanimous verdict of a jury of good and lawful men in open court." Constitution, Art. I, sec. 13.

It is not questioned either that trial by jury is deeply rooted in our institutions or that the term "jury" as understood at common law and as used in the Constitution imports a body of twelve men duly summoned, sworn, and impaneled for the trial of issues joined between litigants, in a civil action or for the determination of facts adduced for and against the accused in a criminal case. *Whitehurst v. Davis,* 3 N. C., 113; *S. v. Scruggs,* 115 N. C., 805; *S. v. Rogers,* 162 N. C., 656; *S. v. Berry,* 190 N. C., 363. The trial proceeds in the presence and under the supervision of a judge authorized to instruct the jury in matters of law; and the word "convicted" as used in section 13 of the Declaration of Rights is qualified by the phrase "but by the unanimous verdict of a jury . . . in open court." Construing this section in *S. v. Alexander,* 76 N. C., 231, the Court said, "Nothing can be a conviction but the verdict of the jury." *Cf. Smith v. Thomas,* 149 N. C., 100; *S. v. Branner, ibid.,* 559; *S. v. Brinkley,* 193 N. C., 747. We are therefore confronted with the question whether the verdict establishing the prisoner's guilt was returned by a jury composed of twelve "good (or free) and lawful men"—*liberos et legales homines;* and in this inquiry the functions of the alternate juror are necessarily involved.

Under the former practice if a juror in a capital felony became incapacitated it was customary to discharge the entire panel and to try the case *de novo.* The act of 1931, *supra,* was designed to cure this evil, and if it preserves the essential attributes of trial by jury, number, impartiality, and unanimity (16 R. C. L., 181, sec. 2), it cannot be said to impair the common-law right as guaranteed by the Constitution.

As to the first element, the jury is composed of twelve men. The alternate technically becomes a juror only when upon an order made by the judge before final submission of the case to the jury he takes the place of a member of the original panel who has died, or who, having become disqualified or incapacitated, has been discharged from further service. From the beginning to the end of the trial the number never varies, and, by a jury of twelve men the verdict is declared.

It is not easy to perceive how the presence of the alternate could influence the reasoning of any juror to the prejudice of the accused. The twelve men by whom the verdict is returned have equal opportunities to hear and appraise the evidence and to receive instructions as to the law. The alternate, who is selected in like manner with the regular jurors and is required to attend at all times upon the trial,

STATE *v.* DALTON.

is given equal opportunity to reach a definite, independent, and accurate conclusion. He is sworn, seated near the jury, and remains with the jurors when they are kept together. He is protected by every safeguard that surrounds the jury and insures an impartial verdict. By the uniform practice in the trial of capital felonies the jurors are warned to refrain from discussing the merits of the case until the testimony is closed and the charge of the court is concluded; whereupon, after retiring, they enter upon their deliberations. If before final submission of the case a vacancy results from the death or incapacity of a juror, the alternate by order of the court becomes one of the jury and serves in all respects as though selected as an original juror, and the essentials of a unanimous verdict of twelve men is thus preserved.

Our research has discovered only a few cases relating to the substitution of an alternate juror; but these cases either in express terms or by implication sustain legislation similar to the act of 1931 (chap. 103), which provides that in certain cases an alternate juror shall serve as though selected as an original juror. *People v. Peete,* 202 Pac. (Cal.), 51; *People v. Howard,* 289 Pac. (Cal.), 830; *ibid.,* 295 Pac. (Cal.), 333. The language of the Court in the first of these cases is appropriate here: "To hold under these circumstances that a defendant is deprived of the right to a trial by a jury of twelve simply because one of the twelve by whom the verdict is rendered may, throughout a part of the trial, have sat and listened to the evidence as an 'alternate' and not as a regular juror, would be to exalt mere form above substance. To so hold would be to leave untouched the vital springs of reality and grasp at the merest shadow of substance." We are of opinion, therefore that the act in question was not enacted in breach of the Declaration of Rights.

The objection to the court's finding in regard to the physical condition of the discharged juror is without merit. The alternate took the place of a juror who was "sick and incapacitated"—that is, deprived by reason of sickness of the power to perform the usual functions of a juror. The finding is in compliance with the requirement of the statute.

Several exceptions were taken to evidence tending to show the dying declarations of the deceased, all of which must be resolved against the prisoner. We cannot say that the foundation for the evidence was not laid. It is not necessary that the declarant should be in the very act of dying; it is enough if he be under the apprehension of impending dissolution, "when all motive for concealment or falsehood is presumed to be absent and the party is in a position as solemn as if an oath had been administered." *S. v. Tilghman,* 33 N. C., 513; *S. v. Franklin,* 192 N. C., 723; *S. v. Wallace,* 203 N. C., 284.

Immediately after she was shot the deceased said, "I believe I am dying"; "I don't believe I can live"; "I think I am going to die"; and

17—206

repeated the substance of these statements from time to time. She was in imminent danger of death, had apprehension of the fact, and death ensued. *S. v. Collins,* 189 N. C., 15. Her declaration of the circumstances directly attending the homicide and forming a part of the *res gestæ* was competent. *S. v. Shelton,* 47 N. C., 360. But such declarations cannot be extended to acts which were antecedent and unrelated to the act causing death. *S. v. Shelton, supra, S. v. Jefferson,* 125 N. C., 712. While two of the witnesses for the State testified that as a part of her dying declaration the deceased repeated a conversation between the prisoner and herself at Strawberry's in the afternoon preceding the firing of the fatal shot at seven o'clock in the evening, the prisoner was not prejudiced thereby for the reason that he testified even more minutely to the same conversation and the same circumstances.

There was evidence that a witness heard "something like somebody may be fussing" at the prisoner's home; that the witness informed a deputy sheriff; and that some days afterwards he saw the deceased and her eyes were dark. The inadvertent admission of this evidence is not sufficient cause for a new trial. The witness did not say that the deceased or the prisoner was at home on this occasion and did not assign any cause for the discolored eye. The testimony contains no definite statement of a single fact from which a natural and legitimate conclusion prejudicial to the prisoner may reasonably be drawn.

Certain other exceptions assail the charge on the ground that the court failed to instruct the jury that in order to convict the prisoner of murder in the first degree, it was necessary to establish the existence of malice in the mind of the prisoner at the time of the killing. These exceptions are untenable. The charge of the court with respect to the existence of malice express or implied was full and accurate. After instructing the jury with respect to the elements of deliberation and premeditation the court said, "Malice is express when a person wilfully, deliberately, and with a fixed purpose intentionally and unlawfully kills another. Malice is implied where an act dangerous to another is done so recklessly and wantonly as to evince depravity of mind and disregard of human life. Malice may arise either from ill-will or grudge. It may also be said to exist when there has been a wrongful, intentional and unlawful killing of a human being without lawful excuse or mitigating circumstances." The instruction is strictly in accord with numerous decisions of this Court. *S. v. Banks,* 143 N. C., 652; *S. v. Roberson,* 150 N. C., 837; *S. v. Brinkley,* 183 N. C., 720; *S. v. Steele,* 190 N. C., 506.

We find no language in the charge which is reasonably susceptible of the construction that the court expressed any opinion as to the guilt

or innocence of the prisoner in violation of law, as indicated in the 20th exception; and the correction of an inadvertent statement of the testimony in one respect, with proper instructions to the jury, was clearly within the province of the court. If the correction had not been made the prisoner would doubtless have made the failure the basis of a distinct exception.

The remaining exceptions are formal and require no separate discussion. We have examined each one of the exceptions entered during the trial and have found after an accurate inspection of the record no sufficient ground for granting a new trial.

The record abounds in evidence of the prisoner's wilful, deliberate, and premeditated purpose to take the life of the deceased—of his studied preparation for achieving the tragic event. He had the benefit of all the testimony adduced in his behalf tending to establish the defense of insanity. In this respect the instructions given the jury were full, clear, and accurate; but the jury declined to accept the pleaded defense. It is manifest that the prisoner has no adequate reason to complain of the charge. We find

No error.