STATE v. JOHN EMERY, BILL EMERY AND LEROY TURNER.

(Filed 8 November, 1944.)

**1. Constitutional Law § 1—**

The will of the people, as expressed in the Constitution, is the supreme law of the land and is subject to change only in the manner prescribed.

**2. Constitutional Law § 3a—**

In searching for this will or intent of the people, as expressed in the Constitution, all cognate provisions are to be brought into view in their entirety and so interpreted as to effectuate the manifest purpose of the instrument.

**3. Same—**

The best way to ascertain the meaning of a word or sentence in the Constitution is to read it contextually and to compare it with other words and sentences with which it stands connected.

**4. Jury § 1: Constitutional Law § 27—**

A jury, as understood at common law and as used in our Constitutions, signifies twelve good (or free) and lawful men in a court of justice, duly selected and impaneled in the case to be tried. Women are excluded from juries *propter defectum sexus*, and aliens and persons under 21 years of age are not competent to serve.

**5. Statutes §§ 5a, 5b—**

Every statute is to be interpreted in the light of the Constitution and the common law and as it was intended to be understood at the time of its enactment.

STATE *v.* EMERY.

**6. Jury § 1—**

Jury service is not a right or privilege guaranteed to anyone. It is an obligation imposed by law upon those who come within a designated class possessing the prescribed qualifications. Women have not yet been assigned to jury duty in this jurisdiction.

**7. Same: Constitutional Law § 27—**

The General Assembly is at liberty to impose the burden of jury service on some and relieve others of the obligation, provided the classification is not in derogation of the 14th Amendment to the Constitution of the U. S. or of our own Constitution. Classification by races would be unlawful, while there is no objection to classification on the basis of sex.

**8. Same—**

With us liability to jury duty is not an incident to the right of suffrage and the 19th Amendment to the Constitution of the U. S. has no bearing on the right of women to serve on juries in North Carolina.

**9. Jury § 2—**

The failure, of a defendant in a criminal prosecution to exhaust his peremptory challenges, does not affect his rights to attack an illegally constituted jury.

DEVIN, J., dissenting.
SEAWELL, J., dissenting.

APPEAL by defendants from *Pless, J.,* at January-February Term, 1944, of POLK.

Criminal prosecution tried upon indictment charging the defendants and another, in six counts, with violations of the prohibition laws.

Upon the trial, after the regular panel of jurors and most of the male bystanders had been exhausted, the sheriff called from among the bystanders two women of good moral character, freeholders and residents of the county, and they were accepted by the solicitor as satisfactory jurors. The defendants moved the court to excuse both women from jury service for the reason that they were not qualified, because of their sex, to serve as petit jurors. Overruled; exceptions. Peremptory challenges were still available to the defendants, but were not used to stand the women aside, as the defendants did not wish unnecessarily to exhaust their challenges. Practically all remaining bystanders, not previously called, were women.

There was a general verdict of guilty as to each of the defendants, which they moved to set aside principally upon the ground of jury defect. Overruled; exceptions.

From the judgments pronounced, the defendants appeal, assigning errors.

*Attorney-General McMullan and Assistant Attorneys-General Patton and Rhodes for the State.*

*J. E. Shipman and Phillip C. Cocke for defendants.*

STACY, C. J.   The questions here posed are (1) whether a jury of ten men and two women suffices as a jury of "good and lawful men" within the meaning of Art. I, sec. 13, of the Constitution; and (2) whether trial by such jury complies with "the law of the land" and accords with "the ancient mode of trial by jury" vouchsafed in Art. I, secs. 17 and 19, of the Constitution.   While these are questions of first impression, the construction heretofore placed on the subject sections of the Constitution would seem to point to negative answers.

The pertinent clauses follow:

"No person shall be convicted of any crime but by the unanimous verdict of a jury of good and lawful men in open court."   Declaration of Rights, Art. I, sec. 13.

"No person ought to be , . . deprived of his . . . liberty or property, but by the law of the land."   Declaration of Rights, Art. I, sec. 17.

"In all controversies at law respecting property, the ancient mode of trial by jury . . . ought to remain sacred and inviolable."   Declaration of Rights, Art. I, sec. 19.

The will of the people as expressed in the Constitution is the supreme law of the land.   *Warrenton v. Warren County,* 215 N. C., 342, 2 S. E. (2d), 463.   In searching for this will or intent all cognate provisions are to be brought into view in their entirety and so interpreted as to effectuate the manifest purposes of the instrument.   *Elliott v. Board of Equalization,* 203 N. C., 749, 166 S. E., 918; *Reade v. Durham,* 173 N. C., 668, 92 S. E., 712.   The best way to ascertain the meaning of a word or sentence in the Constitution is to read it contextually and to compare it with other words and sentences with which it stands connected.   *Noscitur a sociis* is a rule of construction applicable to all written instruments.   11 Am. Jur., 663; 25 R. C. L., 995.

In numerous decisions, it has been said that the word "jury," as here used, is to be given the signification which it had when the Constitution was adopted, *i.e.,* a body of twelve men in a court of justice duly selected and impaneled in the case to be tried.   *S. v. Rogers,* 162 N. C., 656, 78 S. E., 293, 46 L. R. A. (N. S.), 38, Ann. Cas. 1914 A, 867; *S. v. Berry,* 190 N. C., 363, 130 S. E., 12; *S. v. Scruggs,* 115 N. C., 805, 20 S. E., 720; *S. v. Stewart,* 89 N. C., 564; *People v. Powell,* 87 Cal., 348; 31 Am. Jur., 557; 11 Am. Jur., 684.   The jury is to be composed of twelve "good (or free) and lawful men"—*liberi et legales homines.*   *S. v. Dalton,* 206 N. C., 507, 174 S. E., 422.

From ancient times or from the earliest period in the history of the common law, grand and petit juries have consisted exclusively of men. 3 Bl. Com., 352. Women were excluded *propter defectum sexus.* 3 Bl. Com., 362; 4 Id., 395. Blackstone says: "Under the word 'homo,' also, though a name common to both sexes, the female is, however, excluded *propter defectum sexus* (because not of the male sex)," except in cases of writs *de ventre inspiciendo.* 3 Blk. Com., 362, 35 C. J., 245; *People v. Lensen,* 34 Cal. App., 336, 167 Pac., 406; *S. v. James,* 96 N. J. L., 132, 114 Atl., 553, 16 A. L. R., 1141; *S. v. Mittle,* 120 S. C., 526, 113 S. E., 335. Such was the general understanding and meaning of the word "jury" at the time of the adoption of the Constitution in 1868. *S. v. Dalton, supra; S. v. Rogers, supra.* So much so that in Art. I, sec. 13, it is spelled out as "a jury of good and lawful men." True, the number is not mentioned, yet it would hardly be doubted that what the framers had in mind was "a jury of twelve good and lawful men." And the cases so hold. 31 Am. Jur., 625.

At common law a person under 21 years of age was not competent to serve as a juror, and so we have held that the presence of a minor on a grand jury renders its returns quashable, and this without any statute by our Assembly prescribing the age for jurors. *S. v. Griffice,* 74 N. C., 316. Likewise, under the common law an alien was not qualified to serve as a juror, and so we have held, quite recently, that a jury composed of eleven citizens and one alien was not a lawful jury, and this without any statute making alienage a disqualification for jury service in this State. *Hinton v. Hinton,* 196 N. C., 341, 145 S. E., 615.

It follows, therefore, that until the common-law disqualification of sex is removed from our law, women are not required to assume the obligation of jury service. They were ineligible for such service at the time of the adoption of the Constitution in 1868, and the same law which then obtained still subsists. 31 Am. Jur., 594.

"It is elementary that a jury, as understood at common law and as used in our Constitutions, Federal and State, signifies twelve men duly impaneled in the case to be tried." *S. v. Rogers, supra; Traction Co. v. Hof,* 174 U. S., 91; *Patton v. United States,* 281 U. S., 276, 74 L. Ed., 854, 70 A. L. R., 263.

It is a cardinal principle, in the interpretation of constitutions, that they should receive a consistent and uniform construction, so as not to be given one meaning at one time and another meaning at another time, even though circumstances may have so changed as to render a different construction desirable. The will of the people as expressed in the organic law is subject to change only in the manner prescribed by them. *S. v. Knight,* 169 N. C., 333, 85 S. E., 418; 11 Am. Jur., 659.

In support of a different view, it is suggested that by statute, even prior to the adoption of the Constitution, the original jury list was to be selected from the names of all such "persons" as have paid the taxes assessed against them for the preceding year and are of good moral character and of sufficient intelligence. G. S., 9-1. And further that in the construction of statutes, "every word importing the masculine gender only shall extend and be applied to females as well as to males, unless the context clearly shows to the contrary." G. S., 12-3.

Without conceding the present pertinency of these statutory provisions, it would seem that the contextual use of the words "good and lawful men" and "the ancient mode of trial by jury" in the above sections of the Constitution clearly shows a contrary intent. *Re Opinion of Justices,* 237 Mass., 591, 130 N. E., 685. In at least three states, California, Massachusetts and Texas, similar arguments have been considered and rejected. *People v. Lensen, supra; Com. v. Welosky,* 276 Mass., 398, 177 N. E., 656; *Glover v. Cobb,* 123 S. W. (2d), 794.

To say that the law-making body in 1855, thirteen years prior to the adoption of the Constitution, intended to impose, and did impose, upon women the obligation of jury duty, which the framers of the Constitution must have had in mind, and which we are just now finding out— 89 years later—may reveal some ingenuity or enterprise, but the idea could hardly be expected to prevail. In addition to the lateness of the discovery, which alone invites scrutiny, it seems to involve a novel use of the rules of construction.

Every statute is to be considered in the light of the Constitution and with a view to its intent. *Belk Bros. Co. v. Maxwell,* 215 N. C., 10, 200 S. E., 915, 122 A. L. R., 687; *S. v. Humphries,* 210 N. C., 406, 186 S. E., 473. "The intention of the law-makers is the law. This intention is to be gathered from the necessity or reason of the enactment and the meaning of the words, enlarged or restricted according to their real intent. In construing a statute the courts are not confined to the literal meaning of the words. A thing within the intention is regarded within the statute though not within the letter. A thing within the letter is not within the statute if not also within the intention." *Uphoff v. Industrial Board,* 271 Ill., 312, 111 N. E., 128, L. R. A., 1916 E, 329, Ann. Cas., 1917 D, 1. To like effect is the opinion in *Kearney v. Vann,* 154 N. C., 311, 70 S. E., 747. All agree that a statute is to be interpreted as it was intended to be understood at the time of its enactment, and usually with reference to the common law then existent. 50 Am. Jur., 224.

The pertinent considerations were before the Court in *S. v. Mitchell,* 202 N. C., 439, 163 S. E., 581, where *Adams, J.,* delivering the opinion,

said: "Before the adoption of our Constitution it was declared that all such parts of the common law as were theretofore in use within the State and were not destructive of, repugnant to, or inconsistent with the freedom and independence of the State and its form of government and not otherwise provided for, abrogated, repealed, or become obsolete, were in full force within the State. This statute is now in effect. C. S., 970. It is generally conceded that so much of the common law as is in force by virtue of this provision is subject to legislative control and may therefore be modified or repealed. But there are parts of the common law which are not subject to modification or repeal by the Legislature because they are imbedded in the Constitution. . . . It is held, also, that as a rule statutes are to be construed with reference to the common law in existence at the time of their enactment. *Kearney v. Vann,* 154 N. C., 311."

It is contended, however, that since 1868 the public policy of the State has undergone a change in respect of the rights of women, which should carry with it an elimination of the disqualification for jury service *propter defectum sexus. Patton v. United States, supra.* The position is that women are now politically the peers of men, and hence they should be permitted to serve on juries. *S. v. Chase,* 106 Or., 263, 211 Pac., 920. But jury service is not a right or privilege guaranteed to anyone. *S. v. Walker,* 192 Iowa, 823, 185 N. W., 619; 35 C. J., 245. It is an obligation imposed by law upon those who come within a designated class possessing the prescribed qualifications. 31 Am. Jur., 650. Women have not yet been assigned the duty of serving on grand or petit juries in this jurisdiction.

The General Assembly is at liberty to impose the burden of jury service on some and relieve others of the obligation, provided the classification is not in derogation of the 14th Amendment to the Constitution of the United States or of our own Constitution. *Norris v. Alabama,* 294 U. S., 587, 79 L. Ed., 1074; *S. v. Peoples,* 131 N. C., 784, 42 S. E., 814. Of course, to single out the members of one race for jury duty and exclude those equally qualified of another would be an unwarranted discrimination of which members of the excluded race could rightfully complain when called upon to answer or go to trial on an indictment in the courts. *Carter v. Texas,* 177 U. S., 442, 44 L. Ed., 839; *Neal v. Delaware,* 103 U. S., 370, 26 L. Ed., 567; *Strauder v. W. Va.,* 100 U. S., 303, 25 L. Ed., 664; *S. v. Henderson,* 216 N. C., 99, 3 S. E. (2d), 357. But classification on the basis of sex, applicable alike to all races, is after the manner of the common law and has persisted throughout the history of the State. *S. v. Sims,* 213 N. C., 590, 197 S. E., 176; 35 C. J., 245.

Moreover, the suggested interpretation of the statute, if constitutionally permissible, would require the commissioners of the several counties as well as the Federal authorities to place the names of all women, otherwise qualified, upon the jury list for jury service, both State and Federal. See *United States v. Roemig,* 52 Fed. Supp., 857, and cases there cited; Anno. 82 L. Ed., 1058; 31 Am. Jur., 620; 35 C. J., 259. This would lead to quite an innovation in the practical administration of the law which has heretofore prevailed from time immemorial. Long acquiescence in the practical interpretation of a statute is entitled to great weight in arriving at its meaning. It is not thought the real intent of the enactment could have been so generally misunderstood or overlooked for years on end. Then, too, if some of the jurors may be women, all may be women. *Harper v. State,* 90 Tex. Cr. R., 252, 234 S. W., 909. A jury of women, or a jury of men and women, could hardly have been in mind when the only jury known at the time was a jury of "good and lawful men"—*liberos et legales homines juratos.* Taylor's Law Glossary; 11 Am. Jur., 683. In *Whitehurst v. Davis,* 3 N. C., 113, where a caveat was tried by thirteen jurors, the Court observed: "It may be said, if thirteen concur in a verdict, twelve must necessarily have given their assent. But any innovation amounting in the least degree to a departure from the ancient mode may cause a departure in other instances, and in the end endanger or prevent this excellent institution from its usual course. Therefore, no such innovation should be permitted." It were better that the controlling voice should speak again before adopting an interpretation which would impose the obligation of jury service on all women, otherwise qualified, under the provisions of this ancient statute. Obviously, we should think, some exemptions would want to be provided, and other changes made. Anno. 82 L. Ed., 1058.

It is also suggested that the 19th Amendment to the Constitution of the United States, adopted in 1920, may have some bearing upon the question. The effect of this amendment was to eliminate any discrimination in the right of citizens to vote on account of sex. Consequently, the franchise has been extended to both sexes equally in this State. Ch. 18, P. L. Ex. Ses. 1920. With us, however, liability to jury duty is not an incident to the right of suffrage, as in some of the States. *S. v. Walker, supra; People v. Barltz,* 212 Mich., 580, 180 N. W., 423, 12 A. L. R., 520; *Parus v. District Court,* 42 Nev., 229, 174 Pac., 706, 4 A. L. R., 140; *Com. v. Maxwell,* 271 Pa., 378, 114 Atl., 825; Anno. 71 A. L. R., 1336; 31 Am. Jur., 653. It is a far cry from elector to juror. The qualifications of the one are quite different from those of the other. While they may have some requirements in common, they are not correla-

tive or necessarily coexistent or coextensive. 35 C. J., 245. The right to vote and the eligibility for jury service are different subjects, requiring different regulations. *Glover v. Cobb, supra.* One may be a qualified elector and yet not a qualified juror, and *vice versa.* The election laws are inapplicable to the subject of jury duty. *People v. Barnett,* 319 Ill., 403, 150 N. E., 290; *United States v. Roemig, supra.*

Our attention has been called to the many cognate decisions in other states. They reflect a variety of views, depending in each case on the Constitution and laws of the state. "In some states jury duty on the part of women is made compulsory, in others it is optional, and in others women are expressly made ineligible." 35 C. J., 245. We have found no case, however, in a state with constitutional and statutory provisions similar to ours, where a contrary conclusion has been reached. As pointed out in some of the cases, if the law has been changed, the time and manner of its change ought to be discoverable. We have been unable to find any modification of the common law, here prevailing, as it pertains to the specific matter under review. Hence, it is to be regarded as in full force and effect. G. S., 4-1; *S. v. Mitchell,* 202 N. C., 439, 163 S. E., 581. The same thought has been expressed in the States of California, South Carolina and Texas. *People v. Lensen, supra; S. v. Mittle, supra; Glover v. Cobb, supra.*

As a dernier resort, the point is made that a contrary legislative intent may be extracted from ch. 30, Public Laws 1921. This act deals only with titles or designations, and not with the qualifications for the offices and positions mentioned therein. To declare, as the statute does, that the words "governor," "senator," "solicitor," "elector," "executor," "administrator," "collector," "juror," "auditor," and others of like character, "shall when applied to the holder of such office, or occupant of such position, be words of common gender and that they shall be a sufficient designation of the person holding such office or position, whether the holder be a man or woman," is not to say that male and female alike shall be eligible to hold such office or position with no regard to the prescribed qualifications therefor. To impute such a purpose to the act would result in eliminating all qualifications for such offices or positions, save that of "man" or "woman." The proposed construction imports a meaning which the statute does not disclose.

Whether we consider the law outmoded, regard it archaic, or think it should be changed, is neither controlling nor important in its determination. It is ours to declare the law as we find it, and no more. "It is ours to construe the laws and not to make them"—*Hoke, J.,* in *S. v. Barksdale,* 181 N. C., 621, 107 S. E., 505. The law as written is not to be altered or amended by interpretation. *Freight Discrimination Cases,* 95 N. C., 434.

Mr. McIntosh, in his valuable work on North Carolina Practice and Procedure, states the whole case in a single sentence: "Women are not recognized in this State as subject to, or entitled to, serve on juries, and whether they could be so recognized by statute without a change in the Constitution has not been decided." N. C. Practice and Procedure, 592.

The question is not whether women are competent to serve on juries, but whether they are presently eligible to do so. They may be ever so competent, and yet not eligible. Eligibility is prescribed by law. Competency is another matter. The right to vote, or to hold office, is not the test of jury qualification. The judge on the bench may not be eligible to serve as a juror, and generally he is not. It is no impeachment of citizenship to be disqualified for jury service, or to fall outside the class designated for such service.

In considering the broader implications of the case, it may be well to remember that the defendants are on trial, and not the women of the State. Our concern is with the right of the defendants to be tried by a jury of "good and lawful men" as the law provides. This is the crux of the matter. In *Hinton v. Hinton, supra, Brogden, J.,* delivering the opinion of the Court, observed: "It is clear, therefore, that the law not only guarantees the right of trial by jury, but also the right of trial by a proper jury; that is to say, a jury possessing the qualifications contemplated by law." And in *S. v. Griffice, supra, Bynum, J.,* speaking to an indictment by an exceptionable grand jury, put it this way: "The defendant must have the right to have the accusation against him performed by men unexceptionable in respect of qualification."

Finally, the view is advanced that the exceptions should be overruled as harmless since the defendants failed to use all of their peremptory challenges. *S. v. Dixon,* 215 N. C., 438, 2 S. E. (2d), 371; *S. v. Levy,* 187 N. C., 581, 122 S. E., 386; *S. v. Upton,* 170 N. C., 769, 87 S. E., 328; *S. v. English,* 164 N. C., 497, 80 S. E., 72; *S. v. Lipscomb,* 134 N. C., 689, 47 S. E., 44; *S. v. Lambert,* 93 N. C., 618. In reply, the defendants say (1) that they are not required to exhaust their peremptory challenges except in cases of generally qualified jurors; (2) that the principle of waiver is inapplicable to the facts of the instant record as they were compelled, over objection, to choose between the women jurors in the box and other prospective women jurors; and (3) that in no event should a rule of practice prevail over a constitutional provision, or form over substance. *S. v. Camby,* 209 N. C., 50, 182 S. E., 715; *S. v. Hill,* 209 N. C., 53, 182 S. E., 716; *S. v. Pulliam,* 184 N. C., 681, 114 S. E., 394. The rationale of the pertinent decisions would seem to support the defendants' view in respect of the sufficiency of the exceptions. *Hinton v. Hinton, supra; Harper v. State, supra.*

Venire de novo.

STATE v. EMERY.

DEVIN, J., dissenting: The question here is not whether jury duty generally shall be imposed on women, but whether the two women who served on the jury in the case at bar were disqualified solely by reason of sex. Admittedly they were both more than twenty-one years of age, taxpayers, freeholders, and intelligent. Their service on the jury was authorized by statute. The statute regulating the qualification and selection of jurors uses the word "person" (G. S., 9-1, *et seq.*), and it is specifically declared by legislative enactment that the word "juror" shall be a word of common gender and applicable to man or woman alike. G. S., 12-3 (13). The only ground, then, upon which these women can be held disqualified for jury service is that these statutes conflict with the Constitution (Art. I, sec. 13), which declares that no person shall be convicted of crime but by the unanimous verdict of "good and lawful men." The reference in Art. I, sec. 19, to "the ancient mode of trial by jury" relates only to "controversies at law respecting property," and the evident meaning is that trial by jury is the ancient mode.

Is the word "men," as used in sec. 13, to be restricted in meaning to males, or may it be interpreted as applicable also to women? In my opinion the latter view should prevail.

It was urged on the argument by the defendants that, when the framers of the Constitution wrote "good and lawful men," they had in mind only males as competent jurors, and that, therefore, this legislative intent gives to the language used a fixed and unyielding interpretation, now controlling. Let us examine this contention.

The Constitution in which this section is incorporated was framed, adopted and ratified in 1868. When the framers wrote the words "good and lawful men" they must be understood to have had in mind also the then existing legislative interpretation and meaning of the words used. At that time the statute in effect, the Revised Code of 1855, ch. 108, declared that "every word imputing the masculine gender only shall extend to and be applied to females as well as males." The statute then in force construing the meaning of words must be held to shed light on the intent of the framers of the Constitution in the use of those words. The words "good and lawful men" were adapted from the ancient Latin phrase *"liberi et legales,"* meaning freemen and those legally qualified. There is no record that the question of the competency of women as jurors was considered in the Constitutional Convention of 1868 in this connection. Equally so there appears no purpose to disqualify them, and in attempting an interpretation of the intent of the framers of the Constitution we can only do so by consideration of the language used in the light of existing law with which they are presumed to have been acquainted.

Upon another ground, also, I think the language of the Constitution should not be held to a rigid and inelastic construction when it conflicts with the progress of human thought and changing social conditions. It should be more liberally construed so as to meet the needs of a complex and growing civilization. I think this section of the Constitution is capable of the reasonable interpretation, in accord with modern thought, which would not disqualify women for this important service. I think it should be given this interpretation in the light of the progressive changes in the status of women and their equal share with men in the powers and responsibilties of government and justice. I do not think the courts should be restricted to the mere ascertainment of what we think now was in the minds of the framers of the Constitution who, however wisely they laid the foundations, could not envision the limitless future, else we should be fettered by the dead hand of the past.

We must not be inadvertent to the fact that constitutions in this country were created by the people for their own welfare. Both the Constitution of the United States and of North Carolina begin with the words, "We the people . . . do . . . ordain and establish this Constitution." The application of the purpose of written constitutions to all the changing and unforeseen human relationships and achievements of succeeding generations can be attained only by liberal interpretation or wise amendment. As expressed by *Justice Brogden* in *Walker v. Faison,* 202 N. C., 694, 163 S. E., 875, "The law is designed to march with the advancing battalions of life and progress and to safeguard and interpret the changing needs of a commonwealth."

It is held that the disqualification of women for jury service derives from the Constitution, and it is suggested that notwithstanding the 19th Amendment to the Federal Constitution, and the unfettering of women's civil, property and political rights, no steps have been taken to extend to her specific legal qualification for the jury. But it will be recalled that the Legislature in 1921, following the giving of equal suffrage to women, declared that the word "juror" when used in the statutes meant women as well as men, and later the Attorney-General promulgated an opinion and legal advice that women were not disqualified for jury service. In many counties this was accepted and acted upon as a correct interpretation of the Constitution and laws, and women were permitted to serve as jurors. Many of the Superior Court judges have so held. In some counties the names of qualified women are included in the jury lists. So that if we should hold now that women were qualified to serve on the jury, it would effect no change, but would only give added authority to a practice already grown up. The apprehension that to hold women not disqualified for jury service might result in the practical

difficulties suggested in the opinion, is met by the proof that in many states and in some counties in North Carolina women do serve on the jury without detriment to the administration of justice or to the efficiency of the courts.

The question here is not whether women should be required to serve on the jury, but are they disqualified for such service solely on account of sex? To hold them incapable would seem to me to turn the leaf backward instead of forward. The disqualification of sex is outmoded. Women are in the Army, Navy and Marine Corps. They work in factories, shops, on farms, equally with men. They drive buses, trucks, and street cars. They are members of the police force. They are teachers, writers, nurses, physicians. Their work is interwoven with that of men in all forms of business and professional life. They serve in the legislative and executive branches of the government. They practice law at the bar and sit on the bench. One of the highest judicial positions in America, that of Judge of the Circuit Court of Appeals of the United States, is ably filled by a woman. But in North Carolina she would be disqualified to decide an issue of fact in a case involving a petty misdemeanor, solely on the ground that she is a woman. There is an old maxim that when the reason of a law fails the law itself should fail.

Nor do I think that the intent of the framers of the Constitution of 1868, in this respect, is to be ascertained by recurrence to the common law, to the exclusion of more recent statute law, or that the meaning of the word "jury," in the good year 1944, is to be interpreted in the light of the practice in those ancient times. True the common law is still in force in North Carolina, but only in so far as it has not been repealed, become obsolete, or found inconsistent with our institutions (G. S., 4-1). And when by ch. 30, Public Laws 1921, it was declared that the word "juror" should, "when applied to the occupant of such portion," be a "word of common gender" and "a sufficient designation of the person holding such portion, whether the holder be a man or woman," this legislative declaration may not be overlooked. That the Legislature meant something by this Act is apparent, and it is equally clear that the Legislature has power to change or abrogate any part of the common law, unless restrained by some provision of the Constitution. It is a rule of universal application that no statute ought to be held in violation of the Constitution unless it so appears beyond a reasonable doubt. Applying this rule, the statute declaring the word juror applicable to women as well as men should not be held in conflict with the constitutional provision that a jury be composed of good and lawful men, unless clearly necessary to do so. If there is a reasonable doubt about the proper interpretation, it should be resolved in favor of upholding the legislative declaration that juror means woman as well as man.

Though the letter of the Constitution uses the word "men," its spirit is broad enough to include women on an equal plane. St. Paul said, "The letter killeth, but the spirit giveth life." 2 Cor. 3 :6.

I favor the view that the word "men" as used in the Constitution, Art. I, sec. 13, should be interpreted as a word of common gender, and hence that the trial and judgment below, in all other respects free from error, should not be overthrown because an able Superior Court judge held that women were not disqualified by sex from serving on a trial jury.

SEAWELL, J., dissenting: I do not believe that any member of this Court would now care to assert that women are not fitted by intelligence and character to serve on juries. Also, it would be difficult, without begging the question at issue, to point out any incident of citizenship in which women are not now the equals of men. Therefore, the holding to the contrary is based at best on a technicality of the law from which the validity of reason and propriety has long since departed.

To reach that result we are under the necessity of going far back into the common law and following the narrowest rules of construction, to the exclusion of others commonly applied to the Constitution as an expression of fundamental principles of government—rules which are intended to make of the Constitution a living thing, prospective in its application, applicable to the needs of humanity and the changed conditions of society where it is possible for the provisions to be so construed.

"The courts are not inclined to adopt such technical or strained construction as will unduly impair the efficiency of the Legislature to meet responsibilities occasioned by changing conditions of society. It is proper to assume that a constitution is intended to meet and to be applied to new conditions and circumstances as they may arise in the course of the progress of the community." 11 Am. Jur., Constitutional Law, sec. 51. *Jenkins v. State Board of Elections,* 180 N. C., 169, 104 S. E., 346.

Concededly, we may resort to contemporaneous law and conditions for definitions of terms used in the Constitution where the meaning is ambiguous; and we may likewise resort to the *specific intent* of the framers of the Constitution where there is no doubt as to that intent. These are the so-called rules of historical construction. Too narrowly followed, both of them have the vice of laying the dead hand of the past upon the living present. And we gain nothing from such a reference when, at the most, intent is merely assumed from custom or usage; and where, as here, such custom or usage is adequately attributable to other disqualifying conditions, it affords no aid to construction.

The Constitution, Article I, sec. 13—the section with which we are immediately concerned—provides that "no person shall be convicted of

any crime but by the unanimous verdict of a jury of good and lawful men in open court." It may be considered with the provisions of Article I, sec. 19, since they both came out of a common mold. The latter section provides: "In all controversies at law respecting property, the ancient mode of trial by jury is one of the best securities of the rights of people and ought to remain sacred and inviolable." Magna Charta, Bill of Rights, Constitution of 1776, Constitution of 1835, Constitution of 1868.

The expression originally used in the sources from which we obtained it was *"liberi et legales homines,"* and it has always been conceded that the term which we now translate as "men" is a generic word, including both men and women. It is not, *per se,* an ambiguous or equivocal term, depending for its sense—as to which sex is meant—upon the context. It is an inclusive term, and nothing else appearing, means both sexes. It is so used in all the laws which have been devised for the government of humankind from the beginning. It is uniformly so used in all the provisions of our Constitution, except where it has been necessary to express a distinction between the sexes. Where this has been necessary, appropriate words plainly expressing males or females, according to the intent, have been used. Such distinguishing words are used with regard to suffrage. Art. VI, sec. 1. The latter, of course, was automatically amended by the Nineteenth Amendment to the Federal Constitution.

To construe, as meaning *males* a phrase which, *ipsissimis verbis,* speaks to the contrary, resort has been made to the common law as defining the sort of jury intended by the Constitution, with the contention that it necessarily implies trial by a male jury. I pass, for the present, the outstanding fact that there has always been accorded to the Legislature, and to the courts, a reasonable discretion in determining what common law incidents of jury trial are essential to be preserved, in the light of our existing political and social development, with its radical changes of condition, and the further fact that many of the common law incidents of such trial, once so important, have been outmoded and systematically abandoned. When we go to the root of appellants' contention, I think we shall find that it has little or no basis in historical fact.

To exclude women from service on the jury upon the theory of historical interpretation, it must appear that the framers intended to use this word in the Constitution as applicable to men only—with the purpose of excluding women. But the history of the origin of this institution and its adoption into our Constitution makes it clear that those who variously and repeatedly used the formula now under review had no such intent in mind. The circumstances under which the expressions were formulated precluded consideration of the distinction now con-

tended for. The simple fact is that exclusion of women from jury service came from the common law, and not from the wording of the Bill of Rights or of the Constitution. The fact that the Constitution itself did not plainly say a jury of males, as it did in conferring the right of suffrage, also strongly indicates that if there was any ideology on the subject, it was activated only in the common law, not the Constitution, and should disappear when the disqualifications finding expression in the common law had been removed.

*Mr. Justice Holmes,* referring to the Constitution, said: "Continuity with the past is only a necessity and not a duty." Holmes, Collected Legal Papers (1920), 211. When that necessity arises, the past must speak in a clear voice before it is allowed to modify and restrict the plain language of the Constitution and reverse the meaning of its ordinary words in a manner to affect the citizenship of more than one-half of our present population and of generations which are to follow.

When we are called upon to invoke history for definition of a term of vital significance, it is imperative that we see that history in its proper perspective. There can be no guidance for' the present unless we thoroughly understand the essence of the things men struggled for in those remote times and give them credit for some sense of moral and legal values—credit for the thing they had in mind, rather than what a convenient ideology may now place there. Going back to Magna Charta— and most writers regard this document as not only guaranteeing trial by jury, but as paramounting the principle of trial by peers—no student of either legal or political history would make the mistake of contending that the issue between King John and his rebellious subjects was whether jury trial should be by males exclusively, or that such a question had anything to do with the guarantee of jury trial in the Bill of Rights, or in any other source from which we have inherited or drawn the constitutional formula under review. The thing which they intended to put beyond question was the broad fundamental principle of jury trial, to which all other matters were subordinate. No necessity arose for making any distinction between the sexes in such a procedure—the disabilities under which woman rested, her inequality with man before the law, the whole body of inequity and injustice which burdened her and prevented her from being *liber et legalis homo,* or the peer of any man, took care of that event without the necessity of constitutional inhibition. No such question had ripened into issue when our constitutions, including the Constitution of 1868, were adopted. It would be worse than idle to call up the framers of these constitutions now as witnesses to their intent or to speculate what they would have done if such question had arisen. It simply did not arise, and there was no occasion for them to give expres-

STATE *v.* EMERY.

sion to such a distinction or any ideologies they may have had upon the subject within the frame of the Constitution. This should leave the Constitution receptive and adaptive to the changed status of woman before the law, and in the capacities of her citizenship.

But if we could suppose that the common law, in consideration of the low esteem in which woman was held in those times, really had in mind that juries should be composed of males, is this decisive of the question before us? Manifestly not. We still must consider what order of importance that incident has in the scheme of common law jury trial as a means of protection of the liberties and properties of the citizen.

I have referred to the fact that the Legislature and the courts have always been accorded the discretion, within reason, to appraise the incidents of trial by jury at common law and determine those which are essential to be preserved in the light of existing conditions. That power has been too often and too fully exercised by the Legislature in times past to be now gainsaid and is inherent in this Court upon review. The reasonable test has been whether preservation of the particular detail is essential to the security of the liberties and property rights which it was the purpose of the Constitution to guarantee and which were committed to the jury for determination. No one will be so hardy as to assert that the presence of women on juries would imperil these guarantees. Many would refer to the high moral standards of the average woman and the stake she has in the broad questions of preserving law and order and morality, property rights, and those liberties in which she is so much interested as definitely contributing to the contrary result. It has not escaped the attention of the courts that the importance of this common law jury feature is still further reduced because no reason can be assigned for its origin or its retention other than the barbarous view of the inferiority of women which manifested itself in civil and political oppression so akin to slavery that we can find no adequate word to describe her present status of equality with men except emancipation—a term which is in common use in the courts and in the legal profession, and with informed laymen.

I note in the main opinion the following: "We have found no case, however, in a State with constitutional and statutory provisions similar to ours, where a contrary conclusion has been reached. . . ." Such a matter depends on the extent of the research made and the correct appraisal of cases in those jurisdictions where, with constitutions comparable to ours on the point at issue, arguments such as have been advanced in the main opinion have been presented and rejected. Students of law, to whom a dissenting opinion is mainly directed, will make that investigation and form their own conclusion.

However this may be, the courts which have dealt with this question have, with marked uniformity, refused to regard the custom of an exclusively male composition of juries as an essential of jury trial necessary to be preserved within the definition imposed on the Constitution by the common law. It has been classed with those features originally thought so important, but now decayed and abandoned as unfitted to the necessities of modern conditions, although the constitutions have remained the same. *Comrs. v. Maxwell,* 271 Pa., 378, 114 Atl., 825; *S. v. James,* 96 N. J. L., 132, 114 Atl., 553, 16 A. L. R., 1141; *S. v. Manuel,* 41 Cal. App., 153, 182 Pac., 306; *S. v. Walker,* 192 Iowa, 823, 185 N. W., 619; *Com. v. Valotta,* 279 Pa., 84, 123 Atl., 681; *Moore v. S.,* 197 Ind., 640, 151 N. E., 689; *Wilkinson v. S.,* 197 Ind., 642, 151 N. E., 690; *Palmer v. S.,* 197 Ind., 625, 150 N. E., 917. In *Parus v. District Ct.* (1918), 42 Nev., 229, 174 Pac., 706, where an amendment to the Constitution permitted women to vote, it was held that eligibility to jury service followed. In this case we find the following reference to citation from Blackstone: "Nor can we, with any degree of logical force, exclude women from this class upon the basis established by Blackstone, *propter defectum sexus,* because we have eliminated the spirit of this term from our consideration of womankind in modern political and legal life." I have not room for a further quotation from this illuminating and forceful opinion.

In the case of *In re Opinion of Justices,* 237 Mass., 591, 130 N. E., 685 (cited in the main opinion), the House of Representatives of the State of Massachusetts presented to the Supreme Judicial Court of that State a query respecting the power of the General Court to enact a bill making women liable to jury service. The first question was: "Under the existing Constitution and laws of the Commonwealth and the Constitution of the United States, are women liable to jury duty?" That was answered in the negative, not because of the Constitution, but because the statute law would not permit it. The second question was: "If the first question be answered in the negative, has the General Court the constitutional power to enact legislation so that women may be made liable to jury duty?" The Supreme Court answered that question in the affirmative. After noting the fact that numerous common law requirements as to jury trial had been modified or discarded by legislation or by rule, or by custom, the Court said:

"No reason based on the Constitution is perceived why women, when they become qualified to vote under the Nineteenth Amendment to the Federal Constitution, should not also be eligible to jury service, if the General Court so determines. In numerous particulars of a minor nature the trial by jury as it existed at the adoption of the Constitution

has been altered.   Other changes by legislative enactment have been proposed of such vital character as to be beyond the power of the General Court . . . As a result of our constitutional history and practice respecting trial by jury it follows that a change by an amendment to the Constitution in the qualifications of the electorate, such as that wrought by the Nineteenth Amendment, by its own force authorizes the General Court to make a corresponding change in the qualifications of jurors . . . The second question is answered in the affirmative."

When *Commonwealth v. Welosky,* 177 N. E., 656, 276 Mass., 398, came on for a hearing, there had not been made any change in the statute under which women were excluded from voting, and the gist of that decision lies in the statement that the Federal Amendment "did not operate to extend the scope of G. L. C. 234, sec. 1, beyond its previous limit so as to make women liable to jury service *without further legislative action."*   The opinion of the Court with respect to the constitutional question as formerly stated in *In re Opinion of Justices, supra,* was unaltered.

*People v. Lensen,* 34 Cal. Ap., 336, 167 P., 406, cited in the main opinion as rejecting the affirmative of the question presented here, was decided 18 July, 1917, several years before the Federal Amendment to the Constitution was adopted.   (It went into effect 26 August, 1920.)

Notwithstanding that opinion, by a mere change in the statute law, women were permitted to serve as jurors in California; *People v. Manuel, supra;* and the revised view of the Constitution and the law is summed up thus:

"Considered as jurors, the law makes no distinction between men and women.   Subject to qualifications applicable alike to each, they are equally competent to act as jurors."

The law and Constitution of the State of California is fully discussed in *U. S. v. Charles Spencer Chaplin,* 54 Fed. Sup., 682, District Court S. D. Cal. Central Div., 26 February, 1944.   Quoting *People v. Shannon* (1928), 203 Cal., 139, 263 Pac., p. 522, 523, it is said:

"There is nothing in the state or Federal Constitutions, or in any statute, which guarantees one accused of a crime a trial by a jury composed of men and women, or of only men, or of only women, or of any definite proportion of either sex.   His right is to a fair and impartial jury, and not to a jury composed of any particular individuals.   *People v. Durrant,* 116 Cal., 179, 199, 48 Pac., 75.   He cannot complain if he is tried by an impartial jury and can demand nothing more."

See, also, *Re U. S. v. Roemig,* D. C., 52 Fed. Sup., 857, where the statute law was followed without deference to the suggestion that the common law required a male jury.

In *S. v. James, supra,* cited in the main opinion, the defendant challenged his conviction because the jury commissioners failed to select any woman for jury duty. The objection was held not to be good, not on constitutional grounds, but because the statute in terms provided for men only and the Nineteenth Amendment to the Federal Constitution did not have the effect of depriving the statute of its force, since states still had the right to legislate as to the qualification of jurors. Pending the trial of this case and before the hearing in the appellate court, the statute was changed to include women, and the Court animadverts on this. As to the statute, the Court, which theretofore had adhered to a strict definition of the common law jury as reflected in the Constitution, had this to say: "But our constitutional provisions in nowise trammel legislative power with reference to the qualifications of jurors." And referring to the Nineteenth Amendment, said: "The spirit of equality of the sexes which it breathes moved the legislature of New Jersey in 1921 to amend our act concerning jurors so as to include within the description of persons liable to be summoned as grand and petit jurors, women as well as men." Loc. Cit. A. L. R., pp. 1145, 1146.

It is further held in the main opinion that our present jury statute, by reason of its supposed enactment with reference to the common law, must also necessarily be construed as referring to a jury of *males* only, although it does not refer to "men" in any of its parts, but, on the contrary, deliberately and consistently uses the word "persons"—and definitely requires the jury to be drawn from the taxpayers, amongst whom are certainly thousands of women citizens. The question of the jury statute has arisen so frequently in the several states where women are now permitted to vote, and has been so frequently decided upon the view that the statute, unless it, in terms, provides for male jurors only, offers no barrier to eligibility of women, that it seems unnecessary to give that argument any further space.

*S. v. Sims,* 213 N. C., 590, 197 S. E., 176, is no authority with respect either to eligibility of women on the jury or to the effect of their former exclusion. It expressly declines to pass upon the Constitution in this respect, saying:

"We are of the opinion, and so hold, that the defendant in this case, being a male person, cannot raise the question as to whether women may serve on the jury by a motion to quash the bill of indictment; and since it is not properly raised, we are not called upon to decide the question suggested in appellant's brief."

By statutory construction the term men, as used in our statute, is construed to mean both male and female, except where by the context it must be construed to mean males; and the argument that the common

law is superior in force to such a statute is distinctly novel, even if the statute on juries had used that word instead of *person*. Pertinent to this question, both as it applies to the Constitution and to the statute law, is *Cleveland, C., C. & St. L. Ry. Co. v. Wehmeier,* 170 N. E., 27 (Ohio, 1929), loc. cit. 28, 29, as follows:

". . . the makers of the Constitution only considered qualified jurors, as recognized at the time, and, by the term 'jury of twelve men,' they were undoubtedly preserving the common law jury *composed of twelve qualified jurors.* This construction is justified in the light of the use of the word 'men.'

"Since the world began, in all writings concerning the human race, the word 'man' or 'men' has been used in a generic sense, or as representing the human race. The courts in construing the term have given it a generic or restricted meaning, as denoted or indicated by the context and the object sought to be obtained. . . . Applying this definition, and the rule as to the object sought, we find here in section 5 of the Constitution, in question, that the object was to secure a jury of twelve qualified jurors."

Thus, women were permitted to vote, since they were made electors by the Nineteenth Federal Amendment.

Manifestly, the question before us must be settled upon broader grounds of political propriety and the fairness of justice to the times in which we live and in a manner not only to do justice to the enlarged citizenship of the State, but to avail ourselves of its aid in matters affecting the equal administration of justice for all the people. It has been suggested that jury service is not a privilege of women; in the same sense, it is not the privilege of men, since neither can men nor women force themselves into the jury box without previous selection, under any legal procedure of which I know. In any other sense, it is emphatically a privilege of citizenship, since every citizen has, and ought to have, an equal right with every other citizen to participate in every service required or permitted in the administration of justice by the people. When their own rights and liberties are involved, that privilege takes on the color of right, and their exclusion is an unwarranted discrimination and may result in an intolerable injustice.

I have not attempted, of course, an exhaustive catalog of the jurisdictions in which the courts have settled the question now before us contrary to the contentions of the appellants and *contra* the conclusion reached in the main opinion. I have discussed some typical cases and called attention to the holding in some of these cases as to which I think there is a manifest misapprehension in the main opinion, and cited others which are typical of the majority holdings on this subject. I do

not regard citations from our own reports in which the common law jury has been referred to as a jury composed of "twelve men" as of any significance upon the question now before us, since manifestly no distinction of sex was implied. Some jurisdictions—and they are few—may be cited in support of the view. adopted in the main opinion. I feel under no obligation to the narrower reasoning upon which these decisions are based, especially the result of funneling through the Constitution, as a necessity of today, those common law disqualifications of women, now meaningless, so that even the memory of her former political degradation is sufficient to exclude her from a tribunal clothed with the power of passing upon her liberty and property rights, and those of her fellow women.

The validity of precedent as a factor in judicial decision depends upon the soundness of its philosophy, the logic of its application to existing conditions. In the present situation we are certainly not forced to draw our precedents from concepts of law and society which were better forgotten. As I have said, in most jurisdictions of this country, since the adoption of the Nineteenth Amendment to the U. S. Constitution, women are eligible to serve on juries. An examination of the authorities cited will show that this change has commonly been accomplished without amendment to the Constitution; 31 Am. Jur., Jury, sec. 127; although statutes in some instances have had to be amended. Since then women have filled offices in all the states of the Union and in the National Government, from Cabinet Member, U. S. Senator, Governor, Judge, Member of the Legislature, on down to local administrative officers. They also serve in the U. S. Army and Navy, and not a few of them have made the supreme sacrifice in the cause of their country. They pay taxes, but their right to sit upon the jury drawn from the taxpayers is denied. Their liberties and property rights are passed upon by male juries from which they are excluded. The argument for the perpetuation of this intolerable situation rests upon the narrowest of bases. No proponent of that view has attempted to go further than to show that a jury of males was an incident of common law jury and a matter of immemorial custom. None has attempted to justify it as applied to the conditions which now confront us. No one has gainsaid the proposition, so often reiterated in judicial discussions on this subject, that it is not now a fundamentally important incident to be observed, that it goes with other outmoded practices with which the Legislature and the courts have freely dealt as unfitted to present governmental and social necessities.

The most insistent argument advanced in behalf of appellants is that women have never been permitted to serve on juries. Which goes to show that an attitude is more formidable than an argument. "My grand-

sire never shot at such a mark in his life—and neither will I." Ivanhoe, Chapter 13.

The question before us should be settled upon a broader and more discriminating appreciation of the fundamental purposes of jury trial as a part of the judicial investigation, in protecting the rights and liberties committed to that tribunal for determination, without paramounting circumstances and details which must necessarily lose their importance with the changing conditions of society and government. Only in this way may a provision of the Constitution which, in the words it employs, speaks as of today be kept to its true intent as a living principle and an instrument of justice in the lives of people today and tomorrow. That, as I read it, is the controlling principle of decision in a great majority of the well considered judicial opinions which have dealt with this subject. I am in accord with them. I think the defendant has had a fair trial under the Constitution and the laws, and his conviction should be upheld.